## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ROBERT HOFFECKER and HOFFECKER ENTERPRISES IRREVOCABLE GRANTOR TRUST, <br><br>        Plaintiffs, <br><br>     vs. <br><br> BILL J. WALTON, ACCELERATED WEALTH ADVISORS LLC doing business as ACCELERATED WEALTH, ACCELERATED WEALTH, LLC, LUKE VANZO, ACCELERATED CONSULTING AND MANAGEMENT LLC SERIES 2, SOUTH POINTE SQUARE TENNESSEE LLC, and JOHN DOES 1-10 and XYZ CORPORATIONS 1-10, <br><br>        Defendants. | Civil No. <br><br><br><br><br><br><br><br><br><br> **Jury Trial Requested** |

## COMPLAINT

Plaintiffs ROBERT HOFFECKER ("Hoffecker") and HOFFECKER ENTERPRISES IRREVOCABLE GRANTOR TRUST ("HEIG Trust", and collectively "Plaintiffs"), by way of complaint against defendants BILL J. WALTON ("Walton"), ACCELERATED WEALTH ADVISORS LLC doing business as ACCELERATED WEALTH ("AWA"), ACCELERATED WEALTH, LLC ("AW-LLC"), LUKE VANZO ("Vanzo"), ACCELERATED CONSULTING AND MANAGEMENT LLC SERIES 2 ("ACM2"), SOUTH POINTE SQUARE TENNESSEE LLC ("South Pointe"), JOHN DOES 1-10 and XYZ CORPORATIONS 1-10, alleges as follows:

## INTRODUCTION

1.    Plaintiffs bring this civil action pursuant to Section 10(b) of the Securities Exchange Act of 1934, Rule 10(b)-5, codified at 17 C.F.R. § 240.10b-5, and for various violations

of state law, including fraudulent inducement, breach of contract, breach of fiduciary duty, and unjust enrichment, and to redress Defendants' fraudulent and other wrongful conduct in connection with Defendants' provision of investment and related services to Plaintiffs.

2.      As set forth more fully below, this case arises out of a multi-year course of self-dealing, conflicted transactions, and unsuitable investment recommendations by Plaintiffs' trusted investment adviser, defendant Bill J. Walton, and his firm, defendant Accelerated Wealth Advisors LLC ("AWA"), including its president, Luke Vanzo.  While holding themselves out as fiduciaries charged with protecting and prudently growing Plaintiff Hoffecker's substantial wealth, Walton, Vanzo and AWA instead engineered a series of complex structures designed to enrich themselves, their affiliates, and related entities at Plaintiff's expense, in violation of their duties under federal securities laws, state law and contract.

3.      Among other things, Walton and AWA induced Plaintiff[1] to commit approximately $16.5 million to defendant Accelerated Consulting and Management LLC Series 2 ("ACM2") – an entity co-owned and controlled by Walton – through an equity investment and unsecured, long-dated loans whose proceeds were then further funneled to businesses in which Walton and his family held substantial interests, including defendant South Pointe Square Tennessee LLC and an affiliated healthcare fund, while reserving for Walton the power to force Plaintiff's exit at manager-determined or artificially depressed "book value" prices.

4.      At the same time, Walton, AWA and AW-LLC caused Plaintiffs to purchase a $154 million whole-life insurance policy issued by Massachusetts Mutual Life Insurance Company ("MassMutual"), funded by approximately $7.6 million in annual premiums through an irrevocable grantor trust structure that concentrated decision-making and compensation rights in

---

[1] Unless otherwise indicated, references herein to a singular "Plaintiff" shall mean plaintiff Robert Hoffecker.

Walton or his designees and positioned ACM2 to capture insurance proceeds upon Mr. Hoffecker's death.

5.       In this remarkable scenario of self-dealing and inherent conflicts of interest, not only was Walton the Plaintiffs' investment adviser, but he was also the trustee of the Plaintiff's irrevocable trust (which purchased the policy) and he was the producer of the policy, earning undisclosed commissions upon its purchase.  Thus, at the time of policy sale, Walton held multiple conflicting fiduciary roles that created an unconscionable conflict of interest – serving simultaneously as the policy's insurance agent and MassMutual producer[2], the trustee of the Hoffecker Enterprises Irrevocable Grantor Trust that owned the policy, and Plaintiff's investment advisor through AWA.  This convergence of roles created a severe and unethical conflict of interest that was neither properly disclosed nor mitigated.

6.       Walton, Vanzo and AWA further constructed an improperly concentrated portfolio heavily skewed toward illiquid, high-fee private market and structured products – including a more than 70% allocation to private investments and large positions in a highly concentrated 'Accelerator I' fund holding only three underlying positions, distressed credit, and speculative ventures tied to favored third-party managers – while neglecting basic diversification, risk management, and disclosure obligations.

7.       These conflicted and unsuitable recommendations have caused Plaintiffs to suffer millions of dollars in realized losses, substantial additional opportunity-cost damages, and ongoing exposure to further harm.  Through this action, Plaintiffs seek, inter alia, rescission of tainted transactions, compensatory and consequential damages, disgorgement of ill-gotten gains, and all other relief necessary to make them whole.

---

[2]  Plaintiffs intend to file a separate action against MassMutual concerning these transactions and the resulting MassMutual policy.

## JURISDICTION AND VENUE

8.      The Court has original jurisdiction over this case pursuant to 28 U.S.C. § 1331.

9.      The Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper pursuant to 28 U.S.C. § 1391 in that Defendants are located in this District and/or many of the acts complained of occurred here.

11.     Plaintiffs are entitled to a jury trial.

## THE PARTIES

12.     Plaintiff Robert Hoffecker ("Hoffecker") is an individual residing in Dorado, Puerto Rico.

13.     Plaintiff Hoffecker Enterprises Irrevocable Grantor Trust ("HEIG Trust") is a trust created under the laws of Puerto Rico, with its principal location in Puerto Rico.

14.     Defendant Accelerated Wealth Advisors LLC ("AWA") is a limited liability company organized under the laws of Colorado, with its principal place of business located at 13570 Meadowgrass Drive, Suite 100, Colorado Springs, Colorado.  AWA is a registered investment adviser with the United States Securities and Exchange Commission providing investment advisory and wealth management services.

15.     Defendant Accelerated Wealth, LLC ("AW-LLC") is a limited liability company organized under the laws of Colorado, with its principal place of business located at 13570 Meadowgrass Drive, Suite 100, Colorado Springs, Colorado.  Upon information and belief, AW-LLC is AWA's affiliated insurance agency and AWA provides insurance services and products through AW-LLC.

16.     Defendant Bill J. Walton ("Walton") is an individual residing in Dorado, Puerto

4

Rico.  Walton is a registered investment adviser representative associated with AWA, and is licensed as an insurance producer in the state of Colorado.  At all relevant times, Walton acted as Plaintiff's primary investment adviser and was responsible for providing investment advisory services to Plaintiff on behalf of AWA.

17.     Defendant Luke Vanzo ("Vanzo") is an individual residing in Castle Rock, Colorado.  Vanzo is a registered investment adviser representative associated with AWA, and is president of AWA.   At all relevant times, Vanzo acted as Plaintiff's investment adviser representative and was responsible for providing investment advisory services to Plaintiff on behalf of AWA.

18.     Defendant Accelerated Consulting And Management LLC Series 2  ("ACM2") is a limited liability company organized under the laws of Puerto Rico, with its principal place of business located at Carr 693 KM 12.8, Suite 6, Barrio Brena, Vega Alta, Puerto Rico.

19.     Defendant South Pointe Square Tennessee LLC ("South Pointe") is a limited liability company organized under the laws of Puerto Rico, with its principal place of business located at Carr 693 KM 12.9 Suite 6 Breñas, Vega Alta, Puerto Rico.

20.     Defendants John Does 1–10 and XYZ Corporations 1–10 are, upon information and belief, individuals and business entities whose true names and capacities are presently unknown to Plaintiffs, who directly participated in, aided and abetted, facilitated, controlled, and/or otherwise were complicit in the wrongful acts and omissions alleged in this Complaint and/or who received, held, transferred, or otherwise benefitted from Plaintiffs' funds or assets as a result of such acts and omissions.  Plaintiffs will amend this Complaint to substitute the true names and capacities of these Defendants when their identities and roles have been ascertained.

## FACTUAL ALLEGATIONS

21.     In or about April 2023, Walton, Vanzo[3] and AWA began providing investment advisory and wealth management services to Plaintiff.  Over the ensuing year-and-a-half, while occupying a position of trust and professing to act as fiduciaries, Walton, Vanzo and AWA induced Plaintiff to enter into a series of complex investments and transactions – including the ACM2 structure, the HEIG Trust structure, the MassMutual Policy and related trust structure, and a heavily concentrated private markets program – through which Plaintiff committed, conveyed, or transferred in excess of approximately $52 million of capital and premium payments.

22.     Plaintiff Hoffecker entered into a series of investment services agreements with Walton, Vanzo and AWA, including: (i) an Investment Advisory Agreement between AWA and Hoffecker dated April 25, 2023; (ii) an Investment Advisory Agreement between AWA and Hoffecker dated June 8, 2023; and (iii) an Assets Under Advisement Investment Agreement between Hoffecker and AWA, dated August 29, 2024.

23.     The April 25, 2023 Investment Advisory Agreement provides, at section (C), that "AWA hereby accepts appointment and fiduciary duty of utmost good faith to act solely in the best interest of each client".[4]

24.     The June 8, 2023 Investment Advisory Agreement also provides, at section (C), that "AWA hereby accepts appointment and fiduciary duty of utmost good faith to act solely in the best interest of each client".

25.     The August 29, 2024 Assets Under Advisement Investment Agreement – executed by Vanzo on behalf of AWA – provides, within Exhibit I, that "**[i]t is the duty of the Advisor to**

---

[3] Vanzo began providing services to Plaintiff in October 2023.
[4] The April 25, 2023 agreement between Hoffecker and AWA contains an arbitration clause.  Accordingly, Hoffecker has initiated an arbitration proceeding before the American Arbitration Association with respect to certain limited claims.  The subsequent investment services agreements detailed herein do not contain arbitration clauses.

treat the Client(s) with a Fiduciary Standard of Care – meaning the Client's interests will always be at the forefront – ahead of the interests of any individual Advisor representative or the firm. The Advisor will use various methods including this IPS [Investment Policy Statement] and Client interviews, conversations, and meetings to collect the information needed to create this IPS document and to recommend an action plan of investment strategies and/or portfolio investments that are designed to accomplish the Client's goals and objectives". (emphasis in the original).

26.    The August 29, 2024 Assets Under Advisement Investment Agreement further provides within Exhibit I that the Agreement's IPS will "[d]efine the Client's current financial situation", "[e]stablish performance measures and benchmarks to be used if applicable", "[d]escribe proposed investment strategies and styles to be used by Advisor if applicable", and "[e]stablish guidelines for portfolio rebalancing if applicable". However, the IPS did not include any such entries or information.

27.    The August 29, 2024 agreement also states that, "[i]t is agreed that the Investment Policy Statement is a work in progress that *must be updated frequently* in order to remain relevant and appropriate". (emphasis added).

28.    At and around the time that Walton, Vanzo and AWA began providing investment advisory service to Plaintiff, AWA's Form ADV (Part 2A) Firm Brochure, dated September 2023, provided in relevant part that:

> As a client of AWA your investment adviser representative will also serve as an insurance agent under our affiliated insurance agency Accelerated Wealth, LLC. This means your investment adviser representative, acting as an insurance agent, will recommend you place your assets in insurance products and annuities when he or she believes it is in your best interest to do so.
>
> Insurance products and annuities pay commissions to Accelerated Wealth, LLC and to the owners of AWA in their separate capacity

as insurance agents. This presents a conflict of interest to your investment adviser representative as he or she will be more inclined to recommend you place your assets in either insurance products or an advisory account depending on which would pay us more.

AWA has taken steps to manage this conflict of interest by requiring that each investment adviser representative (i) only recommend insurance and annuities when in the best interest of the client and without regard to the financial interest of AWA, its owners and its investment adviser representative or Accelerated Wealth, LLC and its insurance agents, (ii) not recommend insurance and/or annuities which result in your investment adviser representative acting as an insurance agent and/or AWA or Accelerated Wealth, LLC receiving unreasonable compensation related to the recommendation, and (iii) disclose in writing to a client the anticipated commission that Accelerated Wealth, LLC and/or our investment adviser representatives acting in their separate capacity as insurance agents will receive from the recommended insurance or annuity carrier and any material conflicts of interest related to insurance or annuity recommendations.

[Emphasis added].

29.     The Firm Brochure also stated, within Item 8, that "AWA emphasizes diversification as well as risk when evaluating investment manager strategies for inclusion in a client investment portfolio."

30.     The Firm Brochure further stated, within Item 10, that:

In a capacity separate from AWA, your investment adviser representative will also serve as an insurance agent under the affiliated insurance agency Accelerated Wealth, LLC. When acting as an insurance agent, your investment adviser representative can recommend insurance and/or annuity products that pay commissions to Accelerated Wealth, LLC. Such commissions and compensation will vary depending upon the product recommended. Consequently, your investment adviser representative of AWA has an economic incentive to recommend the insurance and annuity products with a higher commission rate, which is a conflict of interest.

The receipt of commissions on insurance products also presents a conflict of interest because it can create an incentive for your investment adviser representative to place your assets in insurance products rather than advisory accounts, depending on which pays

8

more. The commissions for a fixed index annuity is greater initially than the annual investment advisory fee in most situations. Consequently, the advice rendered to you could be biased and creates a conflict of interest. You are under no obligation to implement any insurance or annuity transaction through your investment adviser representative in his or her capacity.

[….]

AWA has taken steps to manage these conflicts of interest by requiring that each investment adviser representative (i) only recommend insurance and annuities when in the best interest of the client and without regard to the financial interest of AWA and its investment adviser representative, (ii) not recommend insurance and/or annuities which result in investment adviser representative and/or AWA receiving unreasonable compensation related to the recommendation, and (iii) disclose in writing to a client any material conflicts of interest related to insurance or annuity recommendations. The disclosure will be given to the advisory client prior to the sale outlining the commission rate or amount of insurance commission that the investment adviser firm and/or supervised person will receive from the insurance company for such purchase, The disclosure will also include the reasoning used in determining how much to allocate to fixed index annuities versus advisory accounts.

This conflict is mitigated by the fact that the Firm, as well as the IARs, have a fiduciary responsibility to place the best interest of the client first and will act in accordance with that responsibility. You are under no obligation to purchase insurance products through our affiliated company. Clients have the option to purchase investment products that are recommended by our IARs through other brokers or agents not affiliated with the Firm. It is our fiduciary duty as an investment advisor to provide advice and investment recommendations that are in the best interest for our client and to put our clients' interests ahead of our own.

31.     Thus, Walton, Vanzo and AWA acknowledged and were well aware of (i) the conflicts of interest inherent in their services, (ii) their obligation to act in Plaintiffs' best interests, and (iii) their obligation – expressly promised in their ADV materials – to disclose, mitigate, and manage those conflicts.

32.     Similarly, AWA's Compliance Manual, effective September 2022, specifically

provided in sections 1.4 and 1.5 that:

### 1.4. Investment Adviser as a Fiduciary

The Firm has adopted the procedures set forth in this Manual to ensure that the Firm and its employees fulfill its fiduciary obligations to its clients. Every employee is responsible for understanding and complying with the rules and procedures set forth in this Manual. Each employee shall at the least, annually sign a written statement in the form of the employee Acknowledgement for Investment Advisory Representatives and Associated Persons Form acknowledging his or her receipt and understanding of, and agreement to abide by, the policies described in this Manual.

### 1.5. The Firm

AWA is a SEC registered investment adviser under the federal Investment Advisers Act of 1940 (the "Advisers Act").

Section 206 of the Advisers Act makes it unlawful for the Firm to engage in fraudulent, deceptive or manipulative conduct. In addition to these specific prohibitions, the Supreme Court of the United States has held that Section 206 imposes a fiduciary duty on investment advisers.

As a fiduciary, the Firm owes its clients more than honesty and good faith alone. The Firm has an affirmative duty to act solely in the best interests of its clients and to make full and fair disclosure of all material facts, particularly where the Firm's interests may conflict with those of its clients.

Pursuant to this duty, the Firm must at all times act in its clients' best interests, and the Firm's conduct will be measured against a higher standard of conduct than that used for mere commercial transactions. Among the specific obligations that the SEC has indicated flow from an adviser's fiduciary duty are:

- A duty to have a reasonable, independent basis for its investment advice;

- A duty to obtain best execution for clients' securities transactions, where the adviser is in a position to direct brokerage transactions;

- A duty to ensure that its investment advice is suitable to the client's objectives, needs and circumstances;

- A duty to refrain from effecting personal securities

transactions inconsistent with client interests; and

- A duty to be loyal to clients.

33.    The Compliance Manual contains a "Prohibited Acts" attachment, for acknowledgement by AWA's representatives, which provides in part that:

> INVESTMENT ADVISORY REPRESENTATIVES, SUPERVISED PERSONS AND AFFILIATED PERSONS OF ACCELERATED WEALTH ADVISORS, LLC (THE "COMPANY") ARE SPECIFICALLY PROHIBITED BY COMPANY POLICY FROM THE FOLLOWING:
>
> 2. To accept, directly or indirectly, from any person, firm, corporation or association, other than the Company, compensation of any nature as a bonus, commission, fee, gratuity or other consideration in connection with any transaction on behalf of the Company or a Client Account.
>
> 4. Act as personal custodian or trustee of securities, stock powers, money, or other property belonging to a client of the Company.
>
> 5. Maintain a joint account in securities with any client or share any benefit with any client resulting from a securities transaction.
>
> 6. Transfer any customer or client asset to own name or name of member of immediate family.
>
> 9. Borrow money or securities from a client.
>
> 10. Agree to repurchase at some future time a security from a client for his or her own account, or for any other account.
>
> 11. Utilize a personal Web site, instant messaging, text messaging, and or a personal e-mail address to communicate with clients regarding investment matters or matters related to their account with Accelerated Wealth Advisors, LLC Fail to notify Accelerated Wealth Advisors, LLC promptly of material changes to a client's new account information (including, but not limited to change of name, change of address, change of investment objectives, or change in financial data).

**A.   ACM2. Conflicted Co-Ownership, Loan Structure, and Governance Terms**

34.    In or about December 2023, at Walton's recommendation and while acting as Plaintiff's investment adviser through AWA, Plaintiff Hoffecker committed a total of

approximately $16.5 million to defendant Accelerated Consulting and Management LLC Series 2 ("ACM2").

35.     This commitment consisted of (a) a $7 million capital contribution in or about December 2023 to purchase a 50% membership interest in ACM2, and (b) a subsequent $9.5 million loan to ACM2 pursuant to a Note Purchase Agreement and Promissory Note dated on or about August 29, 2024.

36.     According to the governing ACM2 documents, including the Note Purchase Agreement and the ACM2 operating and buy-sell agreements, Walton and Hoffecker each beneficially own 50% of ACM2, notwithstanding the fact that Plaintiff Hoffecker committed $16.5 million in capital and credit exposure while Walton contributed only a nominal amount ($100). AWA thus recommended that its own advisory client commit tens of millions of dollars to an entity that was co-owned and co-managed by the adviser himself.

37.     Moreover, it appears that the ACM2 operating agreement, articles of formation, member resolution and buy-sell agreement were not prepared until February 2024, were not executed until on or about March 7, 2024, and were back-dated to December 1, 2023, to give the false impression that the documents were provided to Plaintiff before Walton obtained the investment capital from his client (i.e., Plaintiff Hoffecker).

38.     Immediately following Plaintiff's initial $7 million capital contribution, ACM2 loaned those funds to defendant South Pointe Square Tennessee LLC ("South Pointe") pursuant to a promissory note dated December 26, 2023.

39.     South Pointe is a Walton-controlled entity in which Walton and his family own all of the outstanding equity.

40.     More specifically, upon information and belief, South Pointe is wholly owned by

Arche Media, LLC, which in turn is wholly owned by Walton Family Partners I, LLLP.

41.    Accordingly, Walton, acting as Plaintiff's investment adviser, solicited and obtained funds from Plaintiff and caused those funds to be used to capitalize ACM2—an entity in which Walton held a 50% ownership interest—which, in turn, made a loan to South Pointe, a company owned entirely by Walton and his family.

42.    In or about August 2024, again at Walton's direction and recommendation, Plaintiff Hoffecker entered into a Note Purchase Agreement and related Promissory Note under which he loaned ACM2 an additional $9.5 million at a stated interest rate of approximately 6.01%.

43.    The loan was unsecured and long-dated, with principal and interest not payable until the earlier of (i) 100% occupancy of a real estate project located at 5081 Port Royal Road, Spring Hill, Tennessee and owned by South Pointe, or (ii) August 29, 2038, thereby permitting Plaintiff's capital to be tied up for as long as approximately fourteen (14) years without any guaranteed payment schedule.

44.    The Note Purchase Agreement further provides that the ACM2 note and a related note issued by South Pointe are unsecured obligations that rank *pari passu* with other unsecured creditors and are subordinated to any future secured creditors.

45.    The documents further acknowledge that any future financing by ACM2 or South Pointe is likely to be secured by South Pointe's assets and in a senior position to Plaintiff's notes, placing Plaintiff Hoffecker's $16.5 million exposure at the bottom of the capital structure and substantially increasing his credit risk.

46.    Walton also structured the transaction so that he and his family would receive immediate cash payments out of Plaintiff's $9.5 million loan to ACM2.

47.    The Note Purchase Agreement expressly allocates approximately $551,000 of the

$9.5 million in loan proceeds to be paid directly to Walton and certain of his family members.

48.    At the same time, approximately $7.5 million of the loan proceeds were to be paid to South Pointe (which Walton and his family own in full), and an additional $2 million were allocated to an investment in ASI Healthcare Capital Partners I, L.P. ("ASI Healthcare"), in which Walton personally owns more than 30% of the outstanding partnership interests.

49.    Indeed, as conceded in a Form ADV Part 2A Firm Brochure, Walton serves on the advisory board of and has an indirect financial interest in ASI Healthcare Capital Partners GP, LLC, the general partner of ASI Healthcare.

50.    Inexplicably, the value of ACM2's purported $2 million investment in ASI Healthcare was $828,542.75 as of the end of 2024, pursuant to a year-end statement sent by the company to ACM2, suggesting that Defendants caused Plaintiff to invest in an already-devalued security.

51.    Notably, there was a prior history of SEC concerns and enforcement actions around ASI Healthcare and its associated entities, of which Walton certainly had knowledge at the time that he directed the allocation of Plaintiff's funds to it.

52.    Through these structures, Walton placed himself on multiple sides of the ACM2 transaction: as Plaintiff Hoffecker's investment adviser through AWA; as Plaintiff's purported business partner and 50% co-owner of ACM2; as the controlling owner of South Pointe, the primary borrower and recipient of ACM2 loan proceeds; and as a substantial equity holder in ASI Healthcare, another recipient of ACM2 loan proceeds.  Each of these roles presented critical conflicts of interest and egregious instances of self-dealing.

53.    Plaintiff was thus induced to fund an entity and downstream investments that directly benefited Walton and his family through, among other things, direct payments of

$551,000, equity value in South Pointe, and an increased economic interest in ASI Healthcare.

54.    The Note Purchase Agreement further discloses that, to offset these conflicts, South Pointe purportedly agreed to pay ACM2 an annual consulting fee equal to at least 70% of the value of South Pointe's primary real estate asset plus 40% of South Pointe's annual net profits.

55.    Upon information and belief, South Pointe has not made any such required annual payments to ACM2, depriving Plaintiff of the promised compensation for the risks associated with their loans and capital contributions.

56.    In addition, as noted, Walton caused approximately $2 million of Plaintiff's loan proceeds to be invested in ASI Healthcare despite a documented history of financial distress and bankruptcy filings among related ASI entities.

57.    Not long after ACM2 acquired the ASI Healthcare interest, Walton directed that $1 million of that investment be transferred from ACM2 to his personal "WE Trust", framing it in a February 11, 2025 text message to Plaintiff as an inexplicably necessary transaction because of a purported "large payout expected this year for Criscot [sic]".

58.    This transfer was made notwithstanding language in the ACM2 operating agreement prohibiting members from receiving distributions of capital contributions before the company's liabilities had been paid or adequately provided for.  ACM2's $9.5 million loan obligation to Plaintiff remained outstanding and so the transfer violated the terms of the operating agreement.

59.    The ACM2 operating agreement and buy-sell agreement also confer sweeping control rights and forced-redemption powers on ACM2's managers, including Walton.  Those agreements provide that the managers have the right to require a member to sell his membership interest whenever the managers "feel" or "believe" such redemption is in the company's best

interests, and they grant the managers sole authority to set the price of any such redemption,

60.     If the managers do not set a price, the agreements default to "book value" as determined in an attached schedule.

61.     According to that schedule, the book value assigned to Plaintiff Hoffecker's interest is only $100, despite his having committed $16.5 million of capital and loan exposure to ACM2.

62.     These documents thus permit Walton, acting as manager, both to force Plaintiff's exit from ACM2 and to determine the redemption price, including by defaulting to an artificially depressed book value that bears no reasonable relationship to Plaintiff's actual economic contribution.

63.     While the forced-redemption provisions are nominally mutual, their practical impact is dramatically one-sided: forced redemption at manager-determined or book-value pricing would devastate Plaintiff's multimillion-dollar investment while having negligible effect on Walton's nominal capital contribution.

64.     The ACM2 operating agreement further entrenches Walton's control by providing that managers "cannot be removed unless" they are convicted of a felony involving moral turpitude, effectively making it impossible for Plaintiff to remove Walton as manager regardless of performance, conflicts of interest, or misconduct.

65.     The agreement also requires members to fund additional capital contributions as determined from time to time by members holding a majority interest – i.e., including Walton – with only thirty (30) days' notice, thereby exposing Plaintiff to potentially unlimited capital calls under the threat of dilution or other adverse consequences if he does not comply.

66.     The ACM2 documents also impose restrictive transfer provisions that require any member seeking to exit to first offer his interest to the other member(s), granting the remaining

member a right of first refusal.  In practice, this structure gives Walton veto power over the timing and terms of any voluntary exit by Plaintiff and further traps Plaintiff's capital in an illiquid, manager-controlled vehicle.

67.    At all relevant times, Walton and AWA failed to provide full and fair written disclosure to Plaintiff of the scope and magnitude of these conflicts of interest, including (a) Walton's managerial control over ACM2; (b) his and his family's complete ownership of South Pointe; (c) his substantial personal interest in ASI Healthcare; (d) the $551,000 in direct payments to Walton and his family funded from Plaintiff's loan proceeds; (e) the unsecured, subordinated, and long-dated nature of Plaintiff's $16.5 million exposure; and (f) the forced-redemption, valuation, capital-call, and removal provisions that placed Plaintiff at extreme risk while concentrating control and upside in Walton.

68.    As further alleged below in connection with the MassMutual policy, the ACM2 buy-sell agreement also provides that ACM2 may receive and control life-insurance proceeds on Plaintiff Hoffecker's death, with those proceeds first applied to "operational requirements" determined by the managers and only then distributed pursuant to ACM2's dividend policy, thereby creating an additional, undisclosed incentive for Walton to structure Plaintiff's affairs in a manner that channels life-insurance benefits to ACM2 and its managers rather than to Plaintiff's estate and intended beneficiaries.

69.    In short, despite having a formal advisory relationship with Plaintiff and an express contractual and fiduciary obligation to act solely in their his interests, Walton, Vanzo and AWA instead directed Plaintiff into a deliberately one-sided scheme designed to lock up his capital for the long term and to siphon substantial value to Walton, his family-controlled entities, and entities in which he held significant financial interests.  Rather than constructing a prudent, client-centered

investment strategy, Walton, Vanzo and AWA weaponized their advisory role to engineer a conflicted capital structure that prioritized their own enrichment over Plaintiff's protection.

**B.  The MassMutual Whole Life Policy and Irrevocable Trust Structure**

70.    In or about October 2023, at Walton's recommendation and direction, Plaintiff Hoffecker caused the Hoffecker Enterprises Irrevocable Grantor Trust (the "HEIG Trust") to be created as an irrevocable grantor trust under the laws of Puerto Rico.

71.    The trust was drafted and implemented not as part of any comprehensive estate plan prepared by independent trust and estate counsel, but as a vehicle through which Walton could implement an insurance-based strategy of his own design.

72.    At the time of the HEIG Trust's creation on or about October 11, 2023, Walton had himself installed in dual roles as both (i) Trustee of the HEIG Trust and (ii) Protector of the HEIG Trust, thereby consolidating in himself essentially all decision-making authority over the trust assets and eliminating any meaningful oversight.

73.    Under the trust instrument, the Trustee (i.e. Walton) was granted sweeping discretion to distribute "the whole or any part of the income or principal of the Trust Fund" in such manner as the Trustee "shall from time to time in their discretion think fit," and was further permitted to "ignore entirely the interests of any other person" when exercising such powers.

74.    In addition, the Protector (also Walton) was empowered to withhold or grant consent to key actions by the Trustee, and silence by the Protector for a specified period was deemed consent – effectively allowing Walton to approve his own actions.

75.    Critically, the general role of a trust "protector" is to provide third-party oversight of a trustee's actions in the administration of the trust, and to consider whether or not those actions are in the best interests of the beneficiaries.  For obvious reasons, the trustee and protector roles

are not intended to be vested in the same person.

76.     By appointing himself as both Trustee (with unlimited discretion) and Protector, Walton audaciously and deliberately imbued himself with unchecked authority and no oversight in his operation of the HEIG Trust.

77.     The HEIG Trust was drafted in a manner that permanently stripped Mr. Hoffecker of control over the trust assets.  The Trust is expressly irrevocable; it states that Mr. Hoffecker "shall have no power to alter, amend, revoke, or terminate it in any way."

78.     At the same time, the trust provided Walton, as Trustee, with virtually unlimited compensation rights, authorizing him to "charge and be paid all usual professional or other charges" without meaningful limitation or neutral oversight.

79.     These provisions created a trust structure that entrenched Walton's control and financial incentives at the expense of Plaintiff Hoffecker's interests.

80.     Shortly after the HEIG Trust was established, and again at Walton's recommendation and undertaking, the Trust applied for and caused to be issued a massive whole life insurance policy by MassMutual.  Walton, with and through AWA's insurance arm – AW-LLC, acted as insurance agent and producer of the policy.

81.     Effective November 1, 2023, MassMutual issued policy number 34803521, a whole life policy with a stated death benefit of approximately $154 million (the "MassMutual Policy"), to be owned by the HEIG Trust and insuring Plaintiff Hoffecker's life.

82.     The documentation for the MassMutual Policy is internally inconsistent and irregular.  In some locations, the insured is identified as "Robert Hoffecker," while in others, the insured is listed as "Hoffecker Ent. Irr Grantor Trust."

83.     Even more troubling, Walton signed the insurance paperwork in spaces designated

for the "owner," purportedly in his capacity as the HEIG Trust trustee, and also as the insurance "producer", thereby exercising signature authority over a policy insuring someone else's life and blurring the distinction between advisor, trustee, owner, producer and fiduciary.

84.     The MassMutual Policy required annual premiums of approximately $7.6 million, to be funded from Plaintiff's assets contributed or made available to the HEIG Trust.

85.     These premiums tied up extraordinary amounts of liquid capital in an illiquid whole life product with a cash-value component that, by its nature, is expected to generate significantly lower returns than a diversified portfolio of traditional investments.

86.     Walton, AW-LLC and AWA simply assumed that Plaintiff would be able to continue generating sufficient income to service these massive annual premiums, without conducting or providing to Plaintiff any rigorous, independent analysis of affordability, suitability, or opportunity cost.

87.     The MassMutual Policy was marketed and structured not as a conventional estate-planning tool, but as part of an "infinite banking" scheme under which the cash value of the policy would be borrowed against to fund other investments and transactions recommended or controlled by Walton.

88.     Consistent with this concept, Walton recommended that Plaintiff cause the HEIG Trust to take out a $5 million policy loan under the MassMutual Policy before the second policy anniversary in order to finance additional investments – at a time when the policy's cash values were minimal and such loans were least favorable to the policyholder.

89.     Although that loan was ultimately cancelled, the recommendation itself reflects Defendants' intent to use the MassMutual Policy primarily as a leveraged funding source for his broader investment scheme rather than as a prudently designed insurance product for Plaintiff's

benefit.

90.     The written insurance application and related paperwork submitted to MassMutual represented that the MassMutual Policy was being purchased for "estate planning purposes."

91.     In reality, no formal estate planning analysis was conducted by independent counsel, no separate Irrevocable Life Insurance Trust ("ILIT") was implemented of the type commonly used for bona fide estate-planning life insurance, and Walton's communications with Plaintiff made clear that he intended to deploy an "infinite banking" strategy focused on accessing and recycling policy cash values through loans.

92.     Thus, the stated "estate planning" purpose was at best incomplete and at worst misleading as to the true economic function of the policy.

93.     Industry commentators have warned that "infinite banking" strategies often involve oversimplified and misleading sales presentations that emphasize hypothetical cash value growth and ready access to policy loans, while downplaying the policy's primary function as death-benefit protection, the impact of policy loans on death benefits, and potential tax consequences.

94.     Plaintiff was not adequately informed of these risks or of the degree to which the MassMutual Policy's design exposed them to illiquidity, underperformance, and the risk that loans and charges would erode policy values over time.

95.     Nor was Plaintiff informed of Walton's, AWA's and AW-LLC's egregious conflicts of interest in connection with the MassMutual Policy – namely, that the same individual who was recommending the policy as Plaintiff's investment adviser was also (i) serving as trustee and protector of the HEIG Trust that would own the policy and control its cash value and proceeds, and (ii) acting as MassMutual's insurance producer on the sale, earning substantial, undisclosed commissions and ongoing compensation from the very product he was recommending.

96.    These conflicts were precisely the type of conflicts AWA, Walton, Vanzo, and their affiliates had expressly identified in AWA's September 2023 Form ADV (Part 2A) Firm Brochure. As alleged above, the Firm Brochure represented that AWA would manage and mitigate such conflicts by requiring, among other things, that its investment adviser representatives: (i) recommend insurance products and annuities only when in the client's best interest and without regard to the financial interests of AWA, its owners, its investment adviser representatives, and/or their affiliated insurance agency; (ii) refrain from recommending insurance transactions that would result in unreasonable compensation; and (iii) provide written, pre-sale disclosure to the client identifying material conflicts of interest and disclosing the anticipated commission rate or amount and the reasoning used in determining allocations to insurance products versus advisory accounts.

97.    Notwithstanding those representations, promises and procedures, AWA, Walton and Vanzo did not adhere to them with respect to the MassMutual Policy.

98.    Among other things, Plaintiff Hoffecker was not provided – prior to the sale – with any clear, written disclosure that Walton was simultaneously acting in conflicting roles as Plaintiff's investment adviser, the trustee controlling the policy and its cash value through the HEIG Trust, and MassMutual's insurance producer on the transaction; nor was Plaintiff provided any written disclosure of the commission rate or amount and ongoing compensation Walton and/or his affiliates would receive in connection with the MassMutual Policy, or the reasoning purportedly used to justify allocating Plaintiff's assets to that policy as opposed to other alternatives.

99.    Instead, Defendants proceeded with a transaction riddled with undisclosed self-interest and conflicting roles, depriving Plaintiff of the ability to understand, evaluate, and provide informed consent to the conflicts, and directly contradicting the conflict-management promises

AWA, Walton and Vanzo made in their own Firm Brochure.

100.    Additionally, the structure of the MassMutual Policy created enormous opportunity costs for Plaintiffs.  Based on reasonable return assumptions, the approximately $7.6 million in annual premiums, if invested instead in a diversified portfolio earning a 7% annual return, could have grown to roughly $100 million over ten years and more than $200 million over twenty years. The difference between those potential values and the expected economic performance of the MassMutual Policy represents tens of millions of dollars in lost opportunity, estimated at roughly $46-54 million, directly attributable to the decision to lock Plaintiff's capital into this insurance product.

101.    The MassMutual Policy also intersected directly with the conflicted ACM2 structure engineered by Walton.  The ACM2 Buy–Sell Agreement provides that, upon Plaintiff's death, proceeds of any life insurance policy on his life received by ACM2 are first to be applied to "operational requirements," with only any remaining amounts to be distributed in accordance with ACM2's dividend policy.

102.    By causing Plaintiff to purchase a $154 million MassMutual Policy while simultaneously drafting ACM2's governing documents to allow ACM2 to capture and deploy life insurance proceeds at manager-controlled discretion, Walton positioned ACM2 – and thus himself and his affiliates – to benefit from Plaintiff's death benefit proceeds.

103.    In this way, the MassMutual Policy was an integral part of the broader self-dealing scheme: Walton, acting as MassMutual's producer, stood to receive substantial commissions and renewal compensation on the $154 million whole life policy; as Trustee and Protector of the HEIG Trust (the owner of the policy), he controlled the policy and the flow of premiums and any eventual cash value or policy proceeds; and through ACM2, he structured a mechanism by which a

substantial portion of any death benefit could be diverted to an entity he co-owned and controlled, purportedly to cover "operational requirements," before any balance might inure to Plaintiff's estate or beneficiaries.

104.    As a result of this severely conflicted insurance and trust structure, Plaintiffs have suffered and continue to suffer substantial damages, including (i) the drain of multi-million-dollar annual premiums totaling approximately $15.2 million over two years, curtailed in part by Plaintiff's mitigative surrender of the policy on or about December 9, 2025, (ii) the loss of alternative investment opportunities and corresponding growth, and (iii) exposure to unnecessary risks associated with policy loans and complex "infinite banking" strategies.

### C.  Private Markets Concentration and Unsuitable Investments

105.    During the relevant period, Walton and AWA constructed and maintained an investment portfolio for Plaintiff, in which approximately 77.32% of his assets were placed in illiquid private market investments and only about 21.55% were allocated to traditional, liquid investments.

106.    This extreme tilt toward private markets departed from basic portfolio-diversification principles and exposed Plaintiff to heightened risk and illiquidity while generating higher advisory and management fees for AWA.

107.    The private market allocation recommended and implemented by AWA carried materially higher internal fees, and required a meaningful "liquidity premium" to justify the lack of liquidity.

108.    In practice, however, these investments failed to produce performance commensurate with their illiquidity and cost, causing Plaintiff to bear greater risk and inferior returns relative to more conventional alternatives.

109.    As part of this strategy, AWA placed a significant portion of Plaintiff's capital into an "MG 100 Static" strategy.    In 2024, this single strategy underperformed basic market benchmarks by roughly 183 basis points, translating to approximately $380,000 in performance shortfall attributable solely to poor investment selection and structure.

110.    Contrary to any suggestion that these private market allocations reduced volatility or overall risk, performance data for 2024 shows that the MG 100 Static strategy did not deliver lower standard deviation or risk relative to basic market indices, meaning that Plaintiff was exposed to substantially similar risk while receiving markedly inferior performance.

111.    Even within the "traditional" allocation of investments, AWA steered approximately $10.4 million of Plaintiff Hoffecker's assets into structured notes rather than straightforward equity or index exposure.

112.    Defendants purchased the structured notes at premiums above face value, guaranteeing substantial losses from the date of purchase.[5]    These losses were not market losses or credit losses – they were structural losses built into the investments from day one.

113.    For example, if Defendants caused Hoffecker to pay $1,050,000 to purchase a zero-coupon note with a face value of $1,000,000, Hoffecker was guaranteed to receive exactly $1,000,000 at maturity – a certain loss of $50,000.

114.    No reasonable investment adviser would make such purchases when U.S. Treasury securities yielding 4.5% to 5.0% were contemporaneously available.    The opportunity cost of this catastrophic strategy was significant.

115.    Defendants' conduct demonstrates actual knowledge of or reckless disregard for

---

[5]  Plaintiff Hoffecker is obliged to arbitrate a subset of his claims against AWA pertaining to the structured notes pursuant to an arbitration clause in the Investment Advisory Agreement between AWA and Hoffecker dated April 25, 2023.  The balance of the claims are being pursued against AWA, Walton and Vanzo in this litigation.

Plaintiff Hoffecker's interests. After realizing substantial guaranteed losses from structured notes maturities in early 2024, Defendants doubled down on the same failed strategy, purchasing additional premium-priced notes.

116.    These notes carried costly embedded fees, limited upside potential, and were linked to the worst-performing of three major indices, a structure that was highly likely to lag in rising markets while still rewarding the issuing institutions and fee recipients.

117.    Despite the scale and complexity of this private markets and structured notes program, AWA never prepared or delivered to Plaintiff any written Investment Policy Statement ("IPS") tailored to his objectives and risk tolerance, even though AWA represented in its Form ADV that it prepared such statements for clients to memorialize their investment goals and strategy.

118.    Walton's, Vanzo's and AWA's failure to prepare and provide an IPS to an investor client being advised to invest tens of millions of dollars is astounding.

119.    AWA further concentrated Plaintiff's private markets exposure in a vehicle referred to as "Accelerator I," which, at one point, represented approximately 27% of his total portfolio – roughly $26 million of a $96.2 million portfolio – thereby placing more than a quarter of his assets into a single, highly concentrated fund.

120.    Accelerator I itself was not broadly diversified; rather, it was largely concentrated in only three holdings – Shaw Group Holdings LLC, Aries Linden bonds, and Nano DX – creating extreme single-strategy and single-issuer risk inconsistent with basic diversification principles for a client of Hoffecker's means and objectives.

121.    With respect to Shaw Group Holdings LLC, the information available to Hoffecker was minimal or non-existent. The underlying business, financial condition, and due diligence

process were opaque, and there is, upon information and belief, no documentation showing that AWA conducted or presented robust due diligence before committing millions of dollars of Hoffecker's capital to this holding.

122.    AWA also caused Accelerator I to hold Aries Linden bonds in a subordinated position despite clear signs of credit deterioration.

123.    The Aries bonds were issued by the Union County Improvement Authority to finance the construction and operation of a biosolids gasification facility in Linden, New Jersey. Aries Linden, LLC issued multiple series of bonds between 2019 and 2024, reflecting ongoing capital needs and financial difficulties with the project

124.    These bonds showed severe credit deterioration with 2019 bonds trading at approximately $64.618 earlier this year (representing a loss of over 35% of principal value), demonstrating the consequences of this concentrated approach.

125.    Coupon rates escalated from roughly 6% in 2019 to 12.5% in the 2023–2024 period, signaling increasing financial distress and a rising risk profile even as AWA continued to concentrate Hoffecker's capital in this exposure.

126.    Indeed, Aries has now effectively collapsed.   On December 4, 2025, Aries announced to its investors and bond holders that it had implemented a plan to "idle" its operations, that it was terminating the employment of substantially all of its employees, and that "the Company anticipates that the plant will be in "idle" status by December 31, 2025".  In short, Plaintiff's Aries investment is now effectively a complete loss.

127.    AWA further recommended and maintained a sizable position in Nano DX through Accelerator I, despite multiple red flags that made the investment unsuitable.  Nano DX is a small medical device company that experienced at least two unexpected senior-executive departures

since 2021, in the context of ongoing operating losses and no clear pathway to profitability – factors that severely undermined the likelihood of successful product commercialization and meaningful returns.

128.    In connection with the Nano DX investment, a separate advisory firm, Shepherd Kaplan Krochuk ("SKK"), received a "due diligence fee" of approximately $200,000.  This fee created a direct financial incentive for SKK (and, indirectly, AWA and its network) to place client capital into Nano DX, raising serious concerns that the investment decision was driven by fee-sharing and relationship considerations rather than independent, merit-based analysis for Hoffecker's benefit.

129.    Several of the private market investments recommended for Plaintiff – including Nano DX, Brevet Direct Lending, and Cristcot LLC (Brevet and Cristcot addressed below) – were connected to SKK or related entities, creating what appears to be a "captive" ecosystem of Walton and AWA engaging in and recommending preferred deals within the SKK network.

130.    This pattern supports the inference that AWA favored a closed web of affiliated or interrelated vehicles that generated multiple fee streams for advisors and related parties rather than objectively seeking the best opportunities for Plaintiff.

131.    Throughout his relationship with Plaintiff, Walton repeatedly touted aggressive projected returns for certain Accelerator I holdings, including representations during a February 25, 2025 quarterly call that some investments could achieve returns in the range of 30x to 70x.

132.    There was, upon information and belief, no credible or substantial basis for such projections, and these statements materially influenced Plaintiff to tolerate concentration and risk in these private market positions.

133.    Beyond Accelerator I, AWA directed additional capital into other speculative

private vehicles, reinforcing the excessive concentration and unsuitability of the private markets allocation.

134.    AWA recommended and placed funds into the "Brevet Direct Lending Short Duration Fund," a product whose name and marketing suggested short-duration, lower-risk lending.

135.    In reality, Brevet's portfolio included a large construction and redevelopment loan tied to the historic Charity Hospital project in New Orleans – a long-duration, high-uncertainty construction exposure fundamentally at odds with the "short duration" characterization and associated risk expectations.

136.    AWA also placed Plaintiff into a real estate development structure known as "CREDE," under which profits were split 50/50 between preferred equity investors (including Hoffecker) and CREDE until investors achieved a 3x return, at which point CREDE would receive 100% of profits above that threshold.

137.    This arrangement heavily favored the operating sponsor, giving CREDE an outsized share of upside while relegating Plaintiff, as capital provider, to capped economics despite assuming the bulk of the financial risk.

138.    In addition, margins associated with the CREDE projects were, upon information and belief, merely comparable to industry averages and not expected to improve materially with additional capital.

139.    As a result, Plaintiff Hoffecker's capital was effectively used as long-term patient capital for mediocre return prospects, with the structure skewed toward enriching the sponsor rather than providing appropriate risk-adjusted returns to investors.

140.    Indeed, CREDE recently indicated during a November 25, 2025 update that it has

substantial short-term liquidity issues, that it needs to raise substantial funds within the next few months to meet obligations, and that a recapitalization would otherwise need to occur. In the latter scenario, Plaintiff's current equity position would convert into a subordinated note.

141.    Like has already occurred with the Aries bonds, the CREDE investment appears to be headed toward becoming a complete loss.

142.    AWA further caused Plaintiff to invest in Cristcot LLC, a company developing a suppository applicator that had already accumulated net losses in excess of $10 million.

143.    Given Cristcot's loss history, speculative business model, and limited liquidity, the investment represented yet another highly speculative, illiquid private holding inconsistent with prudent portfolio construction for a client in Hoffecker's position.

144.    Taken together, the concentrated 77.32% allocation to private markets, the 27% concentration in Accelerator I, the speculative and opaque nature of many of the underlying holdings (including Shaw Group, Aries Linden bonds, Nano DX, Brevet, CREDE, and Cristcot), the network of SKK-related investments and fee arrangements, and the absence of a written, client-specific Investment Policy Statement reflect a pattern in which Walton and AWA prioritized fee-generating, illiquid private vehicles over diversified, transparent, and suitable investments tailored to Plaintiff's needs and risk tolerance.

D.  **Misleading, Exaggerated, and/or False Commentary and Return Projections**

145.    Throughout their relationship with Plaintiff, Walton, Vanzo and AWA repeatedly provided Hoffecker with misleading, incorrect, exaggerated, and/or false commentary and projections regarding the status, performance, risk profile, and expected returns of investments they recommended, managed, and/or caused Plaintiff to enter.

146.    For example, on or about February 25, 2025, during a quarterly review call with

Hoffecker (the "February 25, 2025 Call"), Walton (with Vanzo joining later) represented, suggested, and/or implied – among other things – that: AWA had "good, positive updates on every one" of the investments discussed, that AWA had "strong data" supporting expected timing and distributions, and that expected distributions were "pretty substantial."

147.    Walton further represented that, for calendar year 2024, Plaintiff's portfolio performance was "about 18 and a half percent," which Walton highlighted as a performance figure warranting Hoffecker's "reaction" to the number.

148.    Walton also represented that a substantial holding within Accelerator 1A had "grossed up 64 and a half percent" on an "accrual basis," and that Hoffecker's "overall investment into Accelerator One went up 21 and a half percent," while downplaying the distinction between realized liquidity and paper valuation.

149.    With respect to the Aries bonds / Linden facility investment, Walton characterized the investment as effectively protected against loss – stating there was "no risk of loss of money" "from a realistic standpoint," and suggesting it was "guaranteed," including by asserting that a "multi[-]billion dollar family office" stood behind it.  Walton went as far as to glowingly assert that the investment was "going screamingly well", and that "[e]veryone in America would have to lose their money for that [investment] not to be guaranteed".

150.    In further describing the same Aries-related "guarantee," Walton stated that, if the underlying project failed, the family office "has to pony up principle," reinforcing the impression that Plaintiff's principal was effectively backstopped.

151.    With respect to the Brevet investment, Walton touted it as "18%," called it "the best paper out there," and represented that Plaintiff's position was "solid" because the paper was underwritten by a "tens of billions of dollar family office," while also implying the position could

be held for additional time to preserve that yield.

152.    With respect to the CREDE investment, Walton described a highly favorable and protected return outcome – asserting AWA held a "3x guarantee," was in "first lien position," and that Plaintiff's "$5 million is maximum worth 15 million," while projecting imminent/near-term income payments (including "first payments…in March") and framing the expected overall return as effectively locked in at the stated multiple.

153.    With respect to Accelerator 1A and related private holdings, Walton projected extraordinary exit values and multiples – stating, among other things, that an expected 2026 exit could "add about $30 million" and that longer-term total performance was expected to be "around 500 million," which he characterized as "only a 20x," and further claimed that (unless Nano "goes out of business") the "lowest number" he could "conceive of" was a "20x total to the fund."

154.    Walton further insisted these outsized multiples were supported by "current data" and described the projections as "conservative," including suggesting that even a low-end valuation scenario implied multiples such as "30x," while assuring Plaintiff that AWA was not merely speculating.

155.    In discussing Accelerator 1B and other private opportunities, Walton touted extreme upside scenarios, including describing a portfolio company as potentially reaching "a billion dollar plus valuation" and portraying certain holdings as "5 to 20x," while also describing a technology position as a "big audacious coin flip" that would be "one of the largest companies in the world or…worth nothing," and suggesting other "ridiculous upside" (including references to "300x").

156.    With respect to structured products, Walton recommended allocating millions into a three-year S&P 500 structured trade while characterizing it as having "no exposure to loss,"

stating the "chance of a 20% loss is statistically close to zero," and representing that the structure would "put a floor" on the dollars while providing "about 122% of the upside."

157.    Similarly, during a quarterly meeting call on June 3, 2025, Walton and Vanzo provided additional misleading, incorrect, exaggerated, and/or false commentary and projections regarding Plaintiff's investments and Defendants' recommended strategies and the magnitude, safety, and tax treatment of anticipated returns, including by representing, among other things, that (i) Plaintiff's portfolio was "up about 28%" since Defendants "put it in place"; (ii) Defendants could move Plaintiff "from a 5% yield to 11% to 15% yield," including via purportedly "AAA rated" strategies projected to generate "11 to 15%" yields (or more) and roughly "$1,000,000 a month" of income; (iii) the recommended premium-financed life-insurance strategy was an "absolute no brainer," while recommending borrowing at extremely low rates while purportedly achieving substantially higher returns; (iv) that by age 50 Plaintiff would have "$10 million" per year of "tax-free income".

### E.  Regulatory Violations

158.    Walton's and AWA's acts and omissions have run afoul of a host of regulations governing investment advisors, and particularly, the Investment Advisers Act of 1940.

159.    Section 206 of the Investment Advisers Act of 1940 ("Advisers Act") prohibits investment advisers from employing any device, scheme, or artifice to defraud any client or prospective client, and from engaging in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

160.    Section 206 also imposes a fiduciary duty on investment advisers, which includes both a duty of loyalty and a duty of care.  This means the adviser must, at all times, serve the best interest of its client and not subordinate its client's interest to its own.  In other words, an

investment adviser must not place its own interest ahead of its client's interests.

161.    To meet its duty of loyalty, an adviser must make full and fair disclosure to its clients of all material facts relating to the advisory relationship.  An adviser must eliminate or at least expose through full and fair disclosure all conflicts of interest which might incline an investment adviser to render advice which is not disinterested.

162.    The disclosure must be clear and detailed enough for the client to make an informed decision to consent to the conflict of interest or reject it.  An adviser that fails to eliminate or expose through full and fair disclosure conflicts related to an investment that it recommends to its clients violates its fiduciary duty and Section 206 of the Advisers Act.

163.    The duty of care includes, among other things, the duty to provide advice that is suitable for and in the best interest of the client.  An adviser must have a reasonable belief that the advice it provides is suitable for and in the best interests of the client based on the client's objectives.  A reasonable belief that the investment advice is in the best interest of a client also requires that an adviser conduct a reasonable investigation into the investment sufficient not to base its advice on materially inaccurate or incomplete information.

164.    An investment adviser's duty of care also encompasses the duty to provide advice and monitoring at a frequency that is in the best interest of the client, taking into account the scope of the agreed relationship.  An adviser that fails to perform a reasonable investigation into an investment it recommends to a client, or fails to monitor a client's account to evaluate whether the client's portfolio continues to be in the client's best interest, means the adviser does not have a reasonable belief that its advice is in the best interest of the client and therefore breaches the adviser's fiduciary duty and violates Section 206 of the Advisers Act.

### (i)    *Advisers Act Section 206(2)*

165.    At all relevant times, AWA was a registered investment adviser with the SEC, and Walton and Vanzo were registered investment adviser representatives of AWA.

166.    As such, Walton, Vanzo and AWA owed Plaintiff fiduciary duties under the Investment Advisers Act of 1940, including the duties imposed by Section 206(2), which prohibits any transaction, practice, or course of business that operates as a fraud or deceit upon any client and requires an adviser to act with a duty of loyalty and a duty of care – serving the client's best interests and not placing the adviser's own interests ahead of the client's interests.

167.    Instead of honoring these duties, Walton, Vanzo and AWA, as Plaintiff Hoffecker's fiduciary investment advisers, systematically exploited Plaintiff's trust through a pattern of conflicted, self-interested transactions and structurally abusive arrangements designed to benefit Walton, his family, and his related entities at Plaintiff's expense.

168.    These conflicts were not fully and fairly disclosed in a manner that would have allowed informed consent, and Walton, Vanzo and AWA repeatedly recommended and implemented transactions that subordinated Plaintiff's interests to their own.

169.    By reason of the foregoing, Walton, Vanzo and AWA engaged in a series of transactions, practices, and a course of business that collectively operated as a fraud or deceit upon Plaintiff within the meaning of Section 206(2) of the Investment Advisers Act, including but not limited to: (a) exploiting their fiduciary roles and control rights to position themselves and their affiliates to capture multiple streams of value from Plaintiff's capital; (b) recommending highly unsuitable, illiquid, and structurally abusive investments and insurance products; (c) making material misstatements and omissions regarding risks, compensation, and expected performance; and (d) engineering and failing to sufficiently disclose pervasive conflicts of interest in the ACM2,

South Pointe, ASI, and MassMutual structures and transactions.

170.    Indeed, even to the extent that there may have been limited, piecemeal disclosure of any conflicts by Walton, Vanzo and/or AWA within the fine print of certain documents or firm brochures, the conflicts were so pervasive and substantial that they were not and could not be adequately disclosed.

171.    Thus, any purported disclosure was, at most, fragmented and buried in fine print and did not enable Plaintiff to understand and evaluate the true nature, scope, and consequences of the conflicts.

### (ii)    *Advisers Act Section 206(1)*

172.    Section 206(1) of the Investment Advisers Act makes it unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, to employ any device, scheme, or artifice to defraud any client or prospective client.

173.    As set forth above, Walton, Vanzo and AWA employed such devices, schemes, and artifices to defraud Plaintiff, including by structuring, recommending, and executing conflicted transactions and investments that diverted economic benefits to AWA, AW-LLC, Walton, Vanzo, Walton's family, and Walton-affiliated entities; by concealing or minimizing the true nature and magnitude of their conflicts of interest; and by making materially misleading statements and omissions regarding, among other things, (a) ownership, control, and related-party arrangements; (b) compensation, commissions, and other financial incentives; (c) liquidity, valuation, and downside risk; and (d) expected performance.

174.    By reason of the foregoing, Walton, Vanzo and AWA violated Section 206(1) of the Investment Advisers Act.

### (iii)    Advisers Act <u>Section </u>206(4)-2 – Custody Rule

175.    At all relevant times, AWA was registered with the SEC as an investment adviser and was therefore subject to Rule 206(4)-2 under the Investment Advisers Act of 1940 (the "Custody Rule").

176.    The Custody Rule broadly defines "custody" to include "any capacity (such as general partner of a limited partnership, managing member of a limited liability company or a comparable position for another type of pooled investment vehicle, or trustee of a trust) that gives [the adviser] or [its] supervised person legal ownership of or access to client funds or securities."

177.    By design, Walton and AWA placed themselves squarely within this definition. First, Walton served as a co-manager and 50% owner of ACM2, the very entity that received Plaintiff's $16.5 million commitment (comprised of a $7 million equity investment and a $9.5 million loan) at AWA's recommendation.

178.    As co-manager of ACM2, Walton had legal authority over ACM2's bank and investment accounts and the power to direct how Plaintiff's $16.5 million would be deployed, thereby giving him and AWA "legal ownership of or access to client funds or securities" within the meaning of the Custody Rule.

179.    Second, Walton also assumed direct control over Plaintiff's trust assets by causing Plaintiff Hoffecker to establish the HEIG Trust and installing himself in dual roles as both Trustee and Protector.

180.    Under the HEIG trust instrument, Walton was granted extraordinarily broad discretionary authority to distribute "the whole or any part of the income or principal of the Trust Fund" as he "in [his] discretion" deemed fit, and was expressly authorized to "ignore entirely the interests of any other person" when exercising these powers. These roles likewise gave Walton

and AWA custody of Plaintiff's trust-owned assets, including the MassMutual policy and trust-held investment positions.

181.    Additionally, Walton's and AWA's custody violations extended specifically to ACM2's $2 million investment in ASI Healthcare.  As set forth above, Walton caused ACM2 to purchase the ASI Healthcare limited-partnership interest using Plaintiff's funds, and thereafter exercised control over that position – including by directing that $1 million of the ASI Healthcare investment be transferred from ACM2 to Walton's personal "WE Trust."

182.    Because Walton and AWA had custody of Plaintiff's funds and securities through these positions, they were required, among other things, to "maintain those funds and securities" with one or more qualified custodians – such as banks, broker-dealers, futures commission merchants or comparable foreign financial institutions meeting specified criteria.

183.    Instead, Walton and AWA caused Plaintiff's $16.5 million to be funneled from Plaintiff's accounts into ACM2 and then further into adviser-controlled or affiliated entities, including South Pointe Square Tennessee LLC and ASI Healthcare Capital Partners I, L.P., none of which is a bank, broker-dealer, or any other type of qualified custodian.

184.    Plaintiff's capital thus moved out of accounts held at independent financial institutions and into a web of entities controlled by Walton and his family, without the protections and oversight mandated by the Custody Rule.

185.    The Custody Rule further requires advisers with custody either (a) to cause qualified custodians to send quarterly account statements directly to clients, or (b) to send their own quarterly statements to clients while also engaging an independent public accountant to conduct an annual surprise examination of client assets.

186.    AWA did neither with respect to Plaintiff's ACM2 investment and related

downstream investments: Plaintiff did not receive quarterly account statements directly from any qualified custodian reflecting their $16.5 million commitment to ACM2, and upon information and belief, AWA did not obtain, and cannot document, any annual surprise examinations by an independent public accountant covering these assets.

187.    In addition, Rule 206(4)-2 requires an adviser with custody to "notify the client in writing of the qualified custodian's name, address, and the manner in which the funds or securities are maintained, promptly when the account is opened and following any changes to this information."

188.    AWA never provided Plaintiff with written custodial notices identifying any qualified custodian in connection with Plaintiff's $16.5 million ACM2 investment or the routing of those funds into South Pointe, ASI Healthcare or other Walton-affiliated entities.

189.    To the contrary, the structure was deliberately designed so that Plaintiff's money would flow directly into adviser-controlled entities without independent custodial oversight or transparent custodial documentation.

190.    Similarly, by placing himself in the dual roles of Trustee and Protector of the HEIG Trust, with authority to distribute trust principal and income and to withhold information about trust administration from Plaintiff, Walton effectively held custody of trust assets while depriving Plaintiff of basic visibility into how those assets – including the cash value and loan capacity of the $154 million MassMutual policy – were being managed or used.

191.    AWA nonetheless failed to implement Custody Rule protections with respect to those trust assets: there were no independent qualified custodians overseeing the movement of trust funds at Walton's direction, no qualified-custodian account statements sent directly to Plaintiff, and no surprise examinations designed to test whether advisor-controlled entities and

trust accounts held the assets they purported to hold.

192.    Through this combination of (a) adviser-controlled pooled vehicles and affiliates (ACM2, South Pointe, ASI and related entities) and (b) a heavily concentrated trust structure in which Walton or his designee served as both trustee and effective gatekeeper, Walton and AWA systematically evaded the core protections of the Custody Rule.

193.    These custody failures allowed Plaintiff's funds to be moved into conflicted, insider-controlled structures without independent custodial safeguards, facilitated the misdirection of Plaintiff's capital for Walton's and AWA's benefit, and substantially contributed to the massive losses and risks described herein.

194.    AWA's custody rule violations with respect to Plaintiff's investments are systematic breaches of fundamental client protection requirements.

### (iv)    Advisers Act Section 206(3) – Principal Trade Rule

195.    Section 206(3) of the Investment Advisers Act makes it unlawful for an investment adviser, directly or indirectly, while acting as an investment adviser, to sell any security to, or purchase any security from, a client "acting as principal" for its own account (or an affiliate's account) without, *prior to the completion of the transaction*, disclosing in writing the adviser's principal capacity and obtaining the client's informed consent on a *transaction-by-transaction* basis.  Blanket or generalized conflicts language is not sufficient; the adviser must identify each principal transaction and obtain the client's specific consent for that transaction.

196.    Walton and AWA engaged in multiple "principal transactions" within the meaning of Section 206(3) and did so without satisfying these disclosure and consent requirements.

197.    At all relevant times, Walton was both Plaintiff's investment adviser (through AWA) and a 50% owner and co-manager of ACM2.

198.    When he recommended that Plaintiff Hoffecker commit $7 million to purchase a 50% membership interest in ACM2 in December 2023, Walton was recommending that his advisory client buy a security issued by, and from, an entity that Walton himself co-owned and controlled.

199.    That recommendation therefore constituted a principal transaction: Walton, acting as investment adviser, caused his client to enter into a securities transaction with an entity in which he had a direct ownership and managerial interest.

200.    The August 2024 $9.5 million note transaction likewise constituted a principal trade under Section 206(3).  Walton recommended that Plaintiff Hoffecker lend $9.5 million to ACM2 pursuant to a promissory note at 6.01% interest, with no required payments until the earlier of 100% occupancy of the underlying property or August 29, 2038, and with the note expressly unsecured and subordinated to any future secured debt.

201.    The promissory note is itself a "security," and ACM2 – co-owned and managed by Walton – was the issuer/obligor.

202.    In substance, Walton, acting as adviser, caused his advisory client to purchase a security directly from a pooled vehicle he owned and controlled, again triggering Section 206(3).

203.    Walton and AWA compounded these violations through a series of "cascading" principal trades involving ACM2 and ASI Healthcare Capital Partners I, L.P.

204.    After securing Plaintiff's $16.5 million commitment to ACM2, Walton recommended that ACM2 invest $2 million of those proceeds into ASI Healthcare, a private partnership in which Walton personally owns more than 30% of the outstanding partnership interests.

205.    Under SEC guidance, when an adviser or its controlling persons own more than a

specified threshold (commonly 25%) of a pooled investment vehicle, transactions between advisory clients and that vehicle are treated as principal transactions, because the adviser is effectively on both sides of the trade.

206.    Walton's 50% ownership of ACM2 and 30%-or-more ownership of ASI Healthcare thus meant that he was acting as principal, directly or indirectly, in connection with both (i) Plaintiff's investment in ACM2 and (ii) ACM2's investment of Plaintiff's capital into ASI Healthcare.

207.    These intertwined relationships created multiple layers of principal trading:

- First, Walton caused Plaintiff to purchase a 50% membership interest in ACM2 – an entity he co-owned and managed.

- Second, he caused Plaintiff to purchase a $9.5 million unsecured note issued by ACM2, again an entity he co-owned and managed.

- Third, he caused ACM2, funded almost entirely with Plaintiff's capital, to purchase a $2 million interest in ASI Healthcare, where Walton held more than 30% of the outstanding interests.

In each instance, Walton stood to benefit personally (through his equity, control, and direct cash payments) from the very transactions he recommended to Plaintiff.

208.    Upon information and belief, Walton and AWA did not comply with Section 206(3)'s requirements in connection with any of these transactions.

209.    Among other things:

- There was no separate written disclosure provided to Plaintiff, *prior to completion of each transaction*, stating that Walton and/or AWA (or their control persons) were acting as principals in the ACM2 membership interest sale, the ACM2 promissory note issuance, or

ACM2's purchase of ASI Healthcare interests.

- There was no transaction-specific, written consent obtained from Plaintiff acknowledging and approving each of these trades with knowledge that Walton was acting as principal on the other side (directly or indirectly).

- Any generalized conflicts disclosures, boilerplate language in account-opening documents, or generic ADV brochures did not identify these particular principal transactions, did not explain that Plaintiff was effectively buying into adviser-controlled entities or adviser-controlled pooled vehicles, and did not obtain the transaction-by-transaction consent that Section 206(3) requires.

210.    The economic terms of these principal trades underscore the severity of the violation. Plaintiff's $16.5 million commitment effectively capitalized ACM2, yet Walton contributed only a nominal amount ($100) and still retained 50% ownership and managerial control.

211.    Plaintiff's $9.5 million loan to ACM2 was then allocated as follows: $551,000 was paid directly to Walton and his family; $7.5 million was funneled to South Pointe (owned entirely by Walton and his family); and $2 million was invested into ASI Healthcare (30%+ owned by Walton).

212.    By structuring the deals this way, Walton used principal transactions to move Plaintiff's capital into entities in which he had substantial ownership interests and to generate immediate cash payments for himself and his family – all without providing the clear written disclosure and obtaining the informed consent that Section 206(3) demands.

213.    These principal transactions were not isolated missteps but part of a broader pattern of self-dealing. The ACM2 structure, the downstream ASI Healthcare investment, and the web of

related-party entities (including South Pointe and Walton's personal "WE Trust") formed an integrated scheme in which Walton repeatedly stood on both sides of the trade – advising Plaintiff on what to buy while simultaneously owning, controlling, or directly benefiting from the securities being sold.

214.    By engaging in these transactions without providing prior written disclosure of his principal capacity and without obtaining Plaintiff's informed, transaction-specific consent, Walton and AWA violated Section 206(3) of the Investment Advisers Act.

### (v)    *Advisers Act Section 206(4)-7*

215.    Rule 206(4)-7 under the Advisers Act requires registered investment advisers to adopt and implement written policies and procedures reasonably designed to prevent violations of the Advisers Act and the rules thereunder by the adviser and its supervised persons, and to review the adequacy of those policies and procedures and the effectiveness of their implementation no less frequently than annually.

216.    AWA maintained written compliance policies and guidance – including "Prohibited Acts" guidance – that, among other things, restricted or prohibited conduct such as acting as trustee or otherwise taking custody of client assets, engaging in conflicted transactions with clients (including principal transactions), receiving undisclosed compensation, and using unapproved communication channels for advisory business.

217.    Nevertheless, as set forth above, Walton, Vanzo and AWA engaged in and/or permitted precisely these categories of conduct, including by placing Walton in positions of control over Plaintiff's assets (including as Trustee and Protector), engaging in principal transactions and self-dealing through ACM2 and other affiliated entities, and communicating investment recommendations and assurances through text messages and other informal channels, without

implementing adequate controls, supervision, escalation, mitigation, or remediation.

218.    By reason of the foregoing, AWA failed to adopt, implement, and/or enforce compliance policies and procedures reasonably designed to prevent violations of the Investment Advisers Act and the rules thereunder, in violation of Rule 206(4)-7.

### F.   Discovery of Defendants' Schemes, Violations & Breaches

219.    In or about early 2025, as Defendants continued to propose complex investment structures and related transactions – including repeatedly attempting to take out a loan on the MassMutual Policy – Plaintiff grew concerned about the suitability and integrity of the investments and strategies that Defendants had recommended and implemented.

220.    As a result, Plaintiff retained legal counsel to further review his investments and investigate the actions of the Defendants.

221.    Plaintiff's counsel thereafter discovered in June 2025 that Walton, AWA and AW-LLC had, among other things: engineered the conflicted ACM2 and South Pointe structure; funneled Plaintiff's capital into entities in which Walton and his family held substantial economic interests; proposed and implemented the severely conflicted HEIG Trust structure and arrangement; proposed and effected the purchase of the ill-advised MassMutual Policy which was grossly disproportionate to any documented insurance need or estate-planning analysis performed, with proceeds intended to flow to the HEIG Trust; constructed an excessively concentrated, illiquid, and fee-laden private markets portfolio; and engaged in the regulatory violations, breaches of fiduciary duty, misrepresentations, omissions, and other wrongful conduct detailed above.  All the while, Walton positioned himself on all sides of these transactions with numerous inherent and overlapping conflicts of interest, to Defendants' benefit and Plaintiffs' detriment.

222.    On or about July 1, 2025, Plaintiffs' counsel issued a comprehensive letter to

Walton and AWA, formally terminating the advisory relationships and investment advisory agreements, demanding that Walton and AWA cease acting in any advisory or fiduciary capacity for Plaintiff, demanding that they take corrective action to unwind or remediate the conflicted ACM2 and related transactions, account for and disgorge all fees, commissions, and other compensation received in connection with the investments, preserve all relevant documents and communications, and engage in good-faith discussions to compensate Plaintiff for losses and damages.

223.    In response, Walton has largely failed and refused to substantively address or comply with Plaintiff's demands, and has not compensated Plaintiff for the losses and damages arising from his conduct.

224.    Plaintiff Hoffecker initiated an arbitration against Walton and AWA before the American Arbitration Association on or about October 20, 2025, with respect to limited claims subject to arbitration under the Investment Advisory Agreement dated April 25, 2023.  Walton and AWA filed an objection on arbitrability grounds on or about November 20, 2025.

### COUNT I
### Violation of Section 10(b) of the Securities Exchange
### Act of 1934 and Rule 10b-5 (17 C.F.R. § 240.10b-5)
### (Against Walton, Vanzo & AWA)

225.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

226.    Walton, Vanzo and AWA made material misrepresentations and omissions to induce Plaintiff to invest in securities, causing Plaintiff to suffer substantial injury and damages.

227.    Pursuant to 17 C.F.R. § 240.10b-5, it is "unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) to employ any device, scheme, or artifice to

defraud, (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

228.   To state a claim for violation of the Securities Exchange Act § 10(b), a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Charles Schwab Corporation v. Bank of America Corporation*, 883 F.3d 68, 92 (2d Cir. 2018); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (internal quotation marks omitted).

229.   Scienter is "'a mental state embracing intent to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-194 (1976).

230.   As set forth above, Walton, Vanzo and AWA, by use of the mails, telephone, electronic communications, and other instrumentalities of interstate commerce, employed a device, scheme, and artifice to defraud Plaintiff in connection with the purchase and sale of securities, including, without limitation, (i) Plaintiff Hoffecker's $7 million purchase of a 50% membership interest in ACM2, (ii) his $9.5 million purchase of the ACM2 promissory note, (iii) the creation of the HEIG Trust, (iv) the purchase of the MassMutual Policy, and (v) Plaintiff's purchases of interests in private funds, bonds, structured notes, and other securities recommended and implemented by Walton, Vanzo and AWA.

231.    Walton, Vanzo and AWA made numerous untrue statements of material fact, and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, including, without limitation: (a) repeatedly representing in advisory agreements and communications that they would act as fiduciaries and place Plaintiff's interests "at the forefront – ahead of the interests of any individual Advisor representative or the firm," while secretly structuring transactions to benefit Walton and his related entities; (b) representing that AWA took steps to manage the inherent conflicts of interest present in recommending and selling insurance products by requiring its investment advisers, including Walton and Vanzo, to only recommend insurance when in the best interest of the client and without regard to the financial interest of AWA and its investment adviser representatives, by prohibiting the recommendation of insurance which results in representatives and/or AWA receiving unreasonable compensation, and requiring AWA, Walton and Vanzo to disclose in writing to Plaintiff any material conflicts of interest related to insurance recommendations; (c) by failing, prior to the sale of the MassMutual Policy, to outline the commission rate or amount of insurance commission that the investment adviser firm and/or supervised person will receive from the insurance company for the purchase; (d) representing that the ACM2 equity and note investments, and related downstream investments, were appropriate and suitable for Plaintiff without disclosing the one-sided nature of the governance, capital-call, and forced-redemption provisions that exposed Plaintiff capital to extreme risk while protecting Walton's nominal contribution; (e) touting the overall portfolio construction, including the "Accelerator I" vehicle and concentrated private markets program, as prudent and aligned with Plaintiff's objectives while failing to disclose the degree of concentration, illiquidity, and speculative risk; and (f) making aggressive performance projections (including claims of potential

30x–70x returns) without a reasonable basis and without disclosing the true risk profile and downside potential of the underlying securities.

232.    Walton , Vanzo and AWA further omitted to disclose, among other material facts: (a) that Walton and his family owned all of the outstanding equity of South Pointe, the primary borrower and recipient of ACM2 loan proceeds; (b) that Walton personally owned more than 30% of the outstanding partnership interests in ASI Healthcare, another recipient of ACM2 loan proceeds; (c) that $551,000 of Plaintiff's $9.5 million loan proceeds would be paid directly to Walton and his family; (d) that ACM2's governing documents allowed Walton, as manager, to force Plaintiff's redemption and set the redemption price (or default to an artificially depressed $100 book value) notwithstanding Plaintiff's $16.5 million economic stake; (e) the existence and extent of commissions that Walton stood to receive as producer of the MassMutual Policy, and (f) that multiple securities recommended for Plaintiff's portfolio – including Aries Linden bonds, Brevet, CREDE, and Cristcot – were speculative, distressed, or otherwise inconsistent with a prudent, diversified strategy for an investor in Plaintiff's position.

233.    These misstatements and omissions were material.

234.    A reasonable investor in Plaintiff's position would have considered it important in deciding whether, and on what terms, to purchase the ACM2 membership interest and note, and to commit capital to the other securities at issue, that: their adviser secretly co-owned and controlled the issuer; their capital would be funneled to entities wholly or substantially owned by their adviser and his family; their adviser would receive immediate cash payments funded by their loan proceeds; and the contractual and structural terms of the investments dramatically favored their adviser at their expense.

235.    Walton, Vanzo and AWA acted with scienter – that is, with intent to deceive,

manipulate, or defraud Plaintiff, or at a minimum with severe recklessness.

236. Their scienter is evidenced by, among other things: (a) the deliberate design of ACM2, South Pointe, and ASI Healthcare transactions, and creation of the HEIG Trust and purchase of the MassMutual Policy, to route Plaintiff's capital into entities in which Walton held direct ownership and/or control and stood to receive immediate cash and long-term upside; (b) the drafting and use of ACM2 governance provisions that gave Walton unilateral control over Plaintiff's ability to exit and the price at which they could be forced out; (c) the failure to provide full and fair disclosure of these conflicts despite repeated assurances of fiduciary loyalty; (d) the concentration of Plaintiff's portfolio in a narrow set of high-fee, high-risk, and illiquid securities that generated substantial economic benefit for Walton, Vanzo, AWA, and favored managers; and (e) the making of extreme return projections and marketing claims without a reasonable basis.

237. There is a direct and proximate connection between these material misrepresentations and omissions and Plaintiff's transactions, undertakings, and the purchases and holdings of the securities at issue.

238. Plaintiff would not have committed $16.5 million to ACM2, created the HEIG Trust, purchased the MassMutual Policy, or purchased or maintained the other challenged securities positions, on the terms he did, had he known the true facts regarding Walton's, Vanzo's and AWA's conflicts of interest, self-dealing, the one-sided nature of the governing documents, and the actual risk/return profiles of the investments.

239. Plaintiff justifiably and reasonably relied on Walton's, Vanzo's and AWA's misrepresentations and omissions in entering into the ACM2 transactions, creating the HEIG Trust, purchasing the MassMutual Policy, and in purchasing and holding the other securities described above.

240.    Plaintiff engaged Walton, Vanzo and AWA precisely because they held themselves out as fiduciary advisers and wealth managers, signed agreements that expressly committed AWA to act with a fiduciary standard of care, and had no reason to suspect that Walton was secretly structuring transactions for his own benefit and that of his related entities.

241.    Plaintiff lacked equal access to the material information that Walton, Vanzo and AWA possessed or controlled and reasonably relied on his adviser's expertise, recommendations, and disclosures.

242.    As a direct and proximate result of Walton's, Vanzo's and AWA's violations of Section 10(b) and Rule 10b-5, Plaintiff has suffered substantial economic losses and damages, including, without limitation: (a) realized losses and write-downs on securities purchased in reliance on Defendants' misrepresentations and omissions (including distressed or effectively worthless positions such as Aries Linden bonds and, increasingly, CREDE and other private holdings); (b) the erosion in value and heightened risk associated with the ACM2 membership interest and note; (c) the loss of liquidity and flexibility resulting from concentration in illiquid, long-dated, subordinated, and speculative securities; and (d) massive opportunity-cost damages from having tens of millions of dollars diverted into conflicted, under-performing, and unsuitable transactions and investments rather than into diversified portfolios aligned with Plaintiff's true goals and risk tolerance.

243.    These losses were the foreseeable and natural consequence of the scheme and course of business described above: when the concealed risks, structural conflicts, and speculative nature of the securities recommended by Walton, Vanzo and AWA materialized, the value of those securities declined, counterparties faltered or defaulted, projects stalled or collapsed, and Plaintiff's capital was trapped in, or exposed to, vehicles designed primarily to benefit Walton,

Vanzo and related parties.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and (d) such other relief as the Court deems just and equitable.

**COUNT II**
**Control Person Liability Under Section 20(a) of the**
**Securities Exchange Act of 1934 (15 U.S.C. § 78t(a))**
**(Against Walton & Vanzo)**

244.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

245.    As alleged in Count I, Defendant AWA committed primary violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 in connection with the purchase or sale of securities, causing Plaintiff injury and damages.

246.    At all relevant times, Defendant Walton, as founder and owner of AWA, possessed and exercised actual power and control over AWA, including AWA's operations, policies, and practices, and the specific conduct and transactions detailed in this Complaint.

247.    At all relevant times, Defendant Vanzo, as President of AWA, likewise possessed and exercised actual power and control over AWA, including AWA's operations, policies, and practices, and the specific conduct and transactions detailed in this Complaint.

248.    To state a claim under Section 20(a), a plaintiff must allege (i) a primary violation of the Securities Exchange Act and (ii) that the defendant exercised actual power or control over the primary violator.  If such control is shown, liability attaches unless the controlling person acted in good faith and did not directly or indirectly induce the violation.

249.    By reason of the foregoing, Walton and Vanzo are "controlling persons" of AWA within the meaning of Section 20(a), and are liable jointly and severally with, and to the same extent as, AWA for AWA's primary violations of Section 10(b) and Rule 10b-5 as alleged herein.

250.    Walton and Vanzo did not act in good faith and directly or indirectly induced the acts and omissions constituting AWA's violations, including by participating in, directing, authorizing, approving, and/or failing to stop or correct the wrongful conduct alleged in detail herein despite their ability to do so.

251.    As a direct and proximate result of Walton's and Vanzo's control-person violations, Plaintiff has suffered damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants Walton and Vanzo, jointly and severally, and award: (a) compensatory damages, incidental damages, and consequential damages; (b) pre-judgment and post-judgment interest; (c) costs and reasonable attorneys' fees to the extent permitted by law; and (d) such other and further relief as the Court deems just and equitable.

**COUNT III**
**Fraud and Fraudulent Inducement**
**(Against Walton & AWA)**

252.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

253.    The elements of fraud are: (1) a false representation by the defendant; (2) the plaintiff's reasonable and foreseeable reliance thereon; (3) injury to the plaintiff as a result of the reliance; and (4) an intent to defraud. See generally *Fed. Deposit Ins. Corp. v. Kachkar*, No. CV 07-1606 (ADC), 2013 WL 12234000, FN10 (D.P.R. Sept. 5, 2013); *Wadsworth, Inc. v. Schwarz-Nin*, 951 F. Supp. 314, 323 (D.P.R. 1996).

254.     Similarly, fraudulent inducement exists when a party is induced by false statements to execute a contract which he otherwise would not have made.  See generally *Portugues-Santana v. Rekomdiv Int'l*, 657 F.3d 56, 62 (1st Cir. 2011); *Kousisis v. United States*, 605 U.S. 114, 123, 145 S. Ct. 1382, 1391, 221 L. Ed. 2d 781 (2025).

255.     Walton and AWA, by the acts and omissions described above, made numerous false representations of material fact to Plaintiff, and omitted to disclose material facts that they had a duty to disclose, in order to induce Plaintiff to entrust his assets to Walton and AWA and to enter into the ACM2, MassMutual, and private markets transactions at issue in this action.

256.     Among other things, Walton and AWA represented in the Investment Advisory Agreements and Assets Under Advisement Investment Agreement that AWA accepted a "fiduciary duty of utmost good faith to act solely in the best interest" of Plaintiff and that Plaintiff's interests would "always be at the forefront – ahead of the interests of any individual Advisor representative or the firm," and that AWA would recommend investment strategies designed to accomplish Plaintiff's stated goals and objectives.

257.     In reality, as alleged above, Walton and AWA intended to and did structure transactions that placed Walton and his affiliates on multiple sides of Plaintiff's investments and prioritized their own financial gain over Plaintiff's interests.

258.     Walton and AWA further affirmatively represented, and led Plaintiff to believe, that the ACM2 structure was an appropriate, aligned opportunity for Plaintiff, that ACM2 would operate as a legitimate joint-venture vehicle with shared interests between Hoffecker and Walton, and that the associated loan and equity terms were suitable and prudent.

259.     In truth, Walton and AWA concealed and did not sufficiently disclose, among other material facts: (i) that Plaintiff's $16.5 million commitment would be funneled to entities wholly

or substantially owned by Walton and his family, including South Pointe and ASI Healthcare; (ii) that approximately $551,000 of Plaintiff's loan proceeds would be paid directly to Walton and his family; (iii) that ACM2's governing documents were drafted to give Walton extreme control and forced-redemption powers, including the ability to redeem Plaintiff's interest at an artificial "book value" of $100 notwithstanding Plaintiff's $16.5 million economic exposure; and (iv) that the HEIG Trust was structured in such as manner as to give Walton complete control and discretion with respect to the administration of the trust and disposition of its assets, including the MassMutual Policy that was purchased in its name.

260.    In connection with the MassMutual Policy and HEIG Trust structure, Walton and AWA falsely represented and/or implied that the policy was being implemented as part of a prudent "estate planning" strategy designed for Plaintiff's benefit, and that the trust and policy structure were appropriate and suitable for Plaintiff's circumstances.

261.    In truth, the HEIG Trust and MassMutual Policy were engineered primarily to maximize commissions and control for Walton, who simultaneously served as (i) Plaintiff's investment adviser, (ii) trustee and protector of the HEIG Trust that owned the policy, and (iii) MassMutual's producer on the sale.

262.    Walton and AWA failed to disclose the true "infinite banking" concept they were pursuing, the extraordinary illiquidity and opportunity cost associated with annual premiums of approximately $7.6 million, the risk that policy loans and charges would erode value, and the way the ACM2 buy-sell arrangement positioned ACM2 – and thus Walton – to capture life-insurance proceeds upon Mr. Hoffecker's death.

263.    Walton and AWA also misrepresented and/or omitted material facts regarding the private markets and structured products program they constructed for Plaintiff.

264.    They portrayed the overall portfolio, including concentrated positions in private funds, the "Accelerator I" vehicle, Aries Linden bonds, Nano DX, Brevet, CREDE, Cristcot, and large structured note allocations, as consistent with Plaintiff's objectives and risk tolerance and as part of a sophisticated, risk-managed strategy.

265.    In reality, the portfolio was heavily and imprudently concentrated – at times with more than 70% of assets in illiquid private investments and roughly 27% in Accelerator I alone – and exposed Plaintiff to speculative, distressed, or highly asymmetric structures that generated elevated fees and upside for advisors and sponsors while offering poor risk-adjusted returns to Plaintiff.

266.    Walton and AWA concealed or downplayed these risks, failed to provide a written Investment Policy Statement despite representing that they did so for clients, and made extreme performance claims (including projected 30x–70x returns on certain holdings) without a reasonable basis.

267.    At all relevant times, Walton and AWA knew that these representations were false and misleading, or made them with reckless disregard for their truth or falsity, and knowingly withheld material information that was necessary to make their statements not misleading in light of the circumstances.

268.    Walton and AWA made these misrepresentations and omissions with the intent and purpose of inducing Plaintiff to (i) enter into and maintain advisory relationships and fee-generating agreements with AWA, (ii) commit approximately $16.5 million to ACM2 and related downstream investments benefiting Walton and his affiliates, (iii) create a trust and fund a $154 million MassMutual whole life policy through multi-million-dollar annual premiums, and (iv) allocate tens of millions of dollars into the highly concentrated private markets and structured

products program they recommended.

269.    Plaintiff justifiably and reasonably relied on Walton's and AWA's representations and omissions.

270.    Plaintiff specifically engaged Walton and AWA based on their purported expertise and fiduciary status, signed advisory and assets-under-advisement agreements that expressly committed AWA to act with a fiduciary standard of care, and had no reason to suspect that Walton was simultaneously structuring transactions to enrich himself and his related entities.

271.    Plaintiff lacked equal access to the material information within Walton's and AWA's possession and reasonably relied on his adviser's purportedly independent recommendations, risk explanations, and descriptions of the purpose and suitability of the ACM2 structure, the MassMutual Policy and HEIG Trust, investments, and the private markets program.

272.    As a direct and proximate result of Walton's and AWA's fraud and fraudulent inducement, Plaintiff has suffered substantial damages, including, without limitation: (i) the loss, impairment, or severe jeopardy of the capital committed to ACM2 and its downstream investments, including South Pointe and ASI Healthcare; (ii) the drain of more than $15 million in premiums to fund the MassMutual Policy and associated opportunity-cost damages from having those funds locked into an unsuitable insurance structure rather than deployed into prudent, diversified investments; (iii) realized and unrealized losses, write-downs, and severe impairment of value across the private markets and structured-note positions, including effectively complete losses in investments such as Aries and looming losses in CREDE and other vehicles; (iv) increased concentration and illiquidity risk borne by Plaintiff's overall portfolio; and (v) professional fees, costs, and other consequential damages incurred in attempting to unwind, mitigate, or remediate the effects of Defendants' fraudulent scheme.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; (d) punitive damages; and (e) such other relief as the Court deems just and equitable.

**COUNT IV**
**Fraudulent Misrepresentation**
**(Against Walton, Vanzo & AWA)**

273.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

274.    The elements of fraudulent misrepresentation are: (1) the making of a false representation, (2) with fraudulent intent, i.e., with "scienter," (3) intended to induce the plaintiff to rely on the misrepresentation, (4) the misrepresentation does induce reliance, (5) which is justifiable, and (6) which causes damage.  See generally *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997); Restatement (Second) of Torts § 525.

275.    Walton, Vanzo and AWA, individually and acting in concert, made numerous false statements and misrepresentations of material fact to Plaintiff in connection with the advisory relationship, the ACM2 transactions, the MassMutual Policy, and the private markets and structured products program described herein.

276.    These misrepresentations were made orally, in written materials, and through presentations and communications to Plaintiff, and were intended to, and did, induce Plaintiff to enter into and maintain the investment advisory relationship with AWA and to commit tens of millions of dollars to the conflicted and unsuitable investments at issue.

277.    Among other things, Walton, Vanzo and AWA affirmatively represented to

58

Plaintiff that AWA would act as a fiduciary and would "act solely in the best interest" of Plaintiff, place Plaintiff's interests "at the forefront – ahead of the interests of any individual Advisor representative or the firm," and use appropriate methods and diligence to recommend investment strategies and portfolios designed to accomplish Plaintiff's goals and objectives.

278.    These representations were memorialized in AWA's Investment Advisory Agreements and Assets Under Advisement Investment Agreement with Plaintiff and were repeated verbally by Walton and Vanzo in their discussions with Plaintiff.

279.    Walton and AWA further represented to Plaintiff that the ACM2 structure was an appropriate, fairly balanced, and prudently structured vehicle for Plaintiff's capital; that ACM2 and its downstream investments in South Pointe, ASI Healthcare, and related entities offered attractive risk-adjusted returns; and that the loans and capital contributions Plaintiff were being asked to make would be adequately secured and compensated.

280.    In reality, as Walton and AWA knew, ACM2 was co-owned and controlled by Walton; Plaintiff's $16.5 million commitment was largely unsecured, long-dated, and subordinated; and the structure immediately diverted hundreds of thousands of dollars of Plaintiff's capital directly to Walton and his family and to entities in which Walton held substantial personal interests.

281.    Walton, Vanzo and AWA also represented to Plaintiff that the massive allocation to private markets and structured products that they recommended and implemented – including an approximately 77% allocation to illiquid private investments, a roughly 27% concentration in the "Accelerator I" fund, significant exposure to distressed credit such as Aries Linden bonds, and speculative positions in Nano DX, Brevet, CREDE, and Cristcot – was suitable, diversified, and consistent with Plaintiff's objectives and risk tolerance.

282.    These representations were false and misleading because, as Walton , Vanzo and AWA knew or recklessly disregarded, the portfolio was extremely concentrated, illiquid, fee-laden, and exposed Plaintiff to outsized risk and downside with no commensurate expected benefit.

283.    In connection with these investments, Walton and Vanzo repeatedly touted aggressive and unjustified projected returns, including representations that certain Accelerator I holdings could generate returns in the range of 30x to 70x, thereby inducing Plaintiff to tolerate extreme concentration and risk.

284.    Walton, Vanzo and AWA had no reasonable basis for these projections, and knew or recklessly disregarded that such statements materially overstated the realistic prospects of the investments and were likely to mislead Plaintiff.

285.    Walton and Vanzo further misrepresented the nature and purpose of the MassMutual whole-life policy and associated irrevocable trust structure.

286.    Walton and Vanzo represented that the policy was being purchased for legitimate estate-planning purposes, that it was a prudent component of Plaintiff's overall financial and estate plan, and that the trust and policy structure were designed primarily to benefit Plaintiff and his intended beneficiaries.

287.    In truth, no independent estate-planning analysis or conventional ILIT structure was implemented; the policy was designed and marketed as part of an "infinite banking" scheme, with enormous annual premiums and policy loans to be used as a funding source for other investments controlled by Walton; and the trust and ACM2 documents were drafted to channel control and potential insurance proceeds toward ACM2 and Walton-controlled "operational requirements."

288.    Walton, Vanzo and AWA also misrepresented their independence and impartiality

by holding themselves out as unbiased fiduciaries who would avoid or properly manage conflicts of interest.

289.    In reality, as Walton, Vanzo and AWA knew, the ACM2, South Pointe, ASI Healthcare, MassMutual Policy, trust structure, and private markets program were structured to generate and maximize compensation, fees, and personal economic benefits for Walton, his family, Vanzo, AWA, and their associates, including but not limited to direct cash payments of approximately $551,000 to Walton and his family from Plaintiff's loan proceeds, advisory and management fees tied to the private markets program, commissions and renewal compensation on the MassMutual Policy, and fee-sharing or relationship benefits associated with SKK-connected investments.

290.    Each of these representations was false when made, or was made with reckless disregard for the truth, and concerned facts material to Plaintiff's decisions whether to retain AWA as his adviser and Walton and Vanzo as his investment advisor representatives, whether to commit capital to ACM2, South Pointe, and ASI Healthcare, whether to create the HEIG Trust, whether to purchase and maintain the $154 million MassMutual Policy with its $7.6 million annual premiums, and whether to accept the recommended private markets concentration and related investments.

291.    Walton, Vanzo and AWA made these misrepresentations knowingly, willfully, and with the intent to deceive and defraud Plaintiff, or at a minimum with conscious recklessness as to their truth, in order to induce Plaintiff to enter into and maintain the advisory relationship and to execute the transactions and investments that generated substantial fees, commissions, and other economic benefits for Walton, Vanzo, AWA, and their affiliates.

292.    Plaintiff reasonably and justifiably relied on Walton's, Vanzo's and AWA's representations, including their express fiduciary undertakings, purported due-diligence efforts,

and assurances regarding suitability, diversification, and estate-planning benefits.

293.    Plaintiff lacked specialized investment and insurance expertise, retained Walton, Vanzo and AWA precisely because they held themselves out as trusted fiduciaries, and had no reason to suspect that Walton, Vanzo and AWA were misrepresenting material facts and concealing the true nature and risks of the transactions and structures they recommended.

294.    As a direct and proximate result of Walton's, Vanzo's and AWA's fraudulent misrepresentations, Plaintiff has suffered and continues to suffer substantial damages, including, without limitation, millions of dollars in realized losses on the investments at issue, heightened risk of further losses on illiquid and distressed positions, the drain of multi-million-dollar insurance premiums and associated opportunity-cost damages, exposure to adverse trust and governance structures that entrench Walton's control and economic interests, and other consequential and incidental damages in an amount to be proven at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; (d) punitive damages; and (e) such other relief as the Court deems just and equitable.

## COUNT V
### Breach of Fiduciary Duty by Investment Adviser
### (Against Walton, Vanzo & AWA)

295.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

296.    A claim for breach of fiduciary duty requires that a fiduciary duty existed and that the defendant breached that duty.  See generally *Kopittke v. Dealer Mkt. Exch. PR LLC*, No. CV

21-1059 (ADC), 2022 WL 22895016 (D.P.R. Mar. 31, 2022); *Reinhardt v. Gulf Ins. Co.*, 489 F.3d

405 (1st Cir. 2007); *Sewell v. Great N. Ins. Co.*, 535 F.3d 1166, 1172 (10th Cir. 2008).

297.    Walton, Vanzo and AWA, as Plaintiff's investment adviser and adviser

representatives, owed Plaintiff a fiduciary duty of utmost good faith, loyalty, and care in

connection with the management of Plaintiff's assets and the provision of investment advice.

298.    By written agreement, AWA expressly accepted a "fiduciary duty of utmost good

faith to act solely in the best interest of each client" and agreed to treat Plaintiff with a "Fiduciary

Standard of Care" such that Plaintiff's interests would always be placed at the forefront, ahead of

the interests of any individual adviser representative or the firm.

299.    Independently of these contractual undertakings, as a SEC-registered investment

adviser AWA owed fiduciary duties under the Advisers Act, including a duty of loyalty and a duty

of care, requiring that the adviser at all times serve the best interest of its client and not place its

own interest ahead of its client's interests.

300.    Walton and Vanzo, as the primary investment adviser representatives serving

Plaintiff, and Walton, as trustee and protector of the HEIG Trust, likewise owed fiduciary duties

directly to Plaintiff.

301.    The fiduciary duties owed by Walton, Vanzo and AWA included, without

limitation: (a) the duty to provide investment advice that was loyal, prudent, and in Plaintiff's best

interests; (b) the duty to provide full and fair disclosure of all material conflicts of interest and

obtain Plaintiff's informed consent before acting in a conflicted capacity; (c) the duty to avoid,

where possible, self-dealing and conflicted transactions that favored the adviser's interests over

those of the client; (d) the duty to construct and monitor an investment portfolio that was suitable

and appropriately diversified in light of Plaintiff's objectives, risk tolerance, and liquidity needs;

and (e) the duty to implement and follow compliance policies and procedures reasonably designed to identify, manage, and mitigate conflicts and risks.

302.    Walton, Vanzo and AWA breached these fiduciary duties in numerous ways. First, they engineered and recommended the conflicted ACM2 structure under which Plaintiff committed approximately $16.5 million of capital and credit exposure to an entity that Walton co-owned and managed, despite contributing only nominal capital himself.

303.    Walton then caused Plaintiff's funds to be funneled through ACM2 to entities he and his family owned or in which he had substantial personal interests, including South Pointe and ASI Healthcare, while arranging for approximately $551,000 of Plaintiff's loan proceeds to be paid directly to Walton and his family members.

304.    Walton also caused ACM2's governing documents to include extreme, one-sided control, forced-redemption, and valuation provisions that allowed the managers (including Walton) to force Plaintiff's exit at prices tied to artificially depressed "book value" and to entrench Walton's control by making his removal virtually impossible absent a felony conviction involving moral turpitude.

305.    These terms trapped Plaintiff's capital in an illiquid, manager-controlled vehicle and exposed them to extraordinary risk while conferring disproportionate control and economic upside on Walton, in direct contravention of his fiduciary duty of loyalty.

306.    Second, Walton, Vanzo and AWA breached their fiduciary duties in connection with the MassMutual whole life policy and HEIG Trust structure.

307.    Acting simultaneously as Plaintiff's investment adviser, as Trustee and Protector of the HEIG Trust, and as MassMutual's insurance producer on the policy, Walton recommended and implemented a $154 million whole life policy requiring approximately $7.6 million in annual

premiums – tying up enormous amounts of Plaintiff's liquid capital in an illiquid, high-cost product with expected returns materially inferior to a diversified portfolio of traditional investments.

308.    Walton, Vanzo and AWA did so without performing or providing any rigorous, independent analysis of affordability, suitability, or opportunity cost, without arranging a conventional estate-planning structure through independent trust and estates counsel, and while representing that the policy was being purchased for "estate planning purposes" even though it was in fact designed and marketed as part of an "infinite banking" scheme meant to serve as a source of financing for other investments that Walton recommended or controlled.

309.    Walton and Vanzo further recommended that the HEIG Trust take out a $5 million policy loan under the MassMutual policy before the second policy anniversary, at a time when cash values were minimal and such borrowing was least favorable to Plaintiff, thereby prioritizing his broader investment scheme over prudent management of the policy for Plaintiff's benefit.

310.    Through the recommendation and creation of the HEIG Trust and adoption of the HEIG Trust documents, Walton secured for himself sweeping powers to control trust assets and broad rights to compensation while permanently stripping Plaintiff of control, thereby monetizing his fiduciary position as trustee rather than safeguarding Plaintiff's interests.

311.    Walton, Vanzo and AWA also failed to disclose fully and fairly the scope and magnitude of these conflicts to Plaintiff, including Walton's multiple roles as adviser, trustee, protector, and insurance producer and the conflicts inherent in maintaining these myriad roles; his ability to control premium payments, policy loans, and trust distributions; and the manner in which the ACM2 buy-sell provisions positioned ACM2 – and thus Walton – to capture life-insurance proceeds at Plaintiff's expense.

312.    Third, Walton, Vanzo and AWA breached their fiduciary duties by constructing

and maintaining an unduly risky and unsuitable investment program centered on extreme concentration in illiquid, high-fee private market and structured products. Walton, Vanzo and AWA caused approximately 77.32% of Hoffecker's portfolio to be invested in private market holdings and only about 21.55% to be allocated to traditional, liquid investments – a structure that defied basic diversification principles and appears designed primarily to maximize advisory and related fees.

313.    Within this allocation, Walton, Vanzo and AWA concentrated roughly 27% of the portfolio in a single "Accelerator I" fund, itself heavily concentrated in only three holdings, including distressed Aries Linden bonds and Nano DX, despite clear red flags and deteriorating credit and business fundamentals.

314.    Walton, Vanzo and AWA also recommended and maintained investments in other speculative vehicles such as Brevet, CREDE, and Cristcot, including structures that skewed economics heavily in favor of sponsors while relegating Plaintiff to capped or subordinated returns despite bearing the lion's share of risk.

315.    Despite the scale, complexity, and illiquidity of this private markets and structured notes program, Walton, Vanzo and AWA never prepared or delivered a completed, client-specific Investment Policy Statement memorializing Plaintiff's objectives, risk tolerance, and strategy, and failed to frequently update the IPS, contrary to AWA's own Form ADV representations. This failure further evidences their disregard for the duty of care and prudent portfolio construction.

316.    Fourth, Walton, Vanzo and AWA failed to establish and follow an adequate compliance program reasonably designed to identify and address conflicts and suitability issues across Plaintiff's portfolio.

317.    The ACM2 co-ownership and loan structure, the web of SKK-related investments

and fee arrangements, the distressed Aries bonds exposure, the Brevet strategy mismatch, the CREDE sponsor-friendly terms, and the MassMutual "infinite banking" arrangement all should have triggered heightened compliance review and mitigation of conflicts.  Instead, they were allowed to proceed as part of a systematic pattern of self-interested advice.

318.    Collectively, these acts and omissions constitute multiple, ongoing breaches of Walton's, Vanzo's and AWA's fiduciary duties of loyalty and care to Plaintiff.  Rather than avoiding conflicts and structuring transactions to serve Plaintiff's best interests, Walton, Vanzo and AWA repeatedly structured and recommended transactions that subordinated Plaintiff's interests to their own, used extensive documentation as "window dressing" to justify fundamentally unfair arrangements, and systematically exploited Plaintiff's trust.

319.    As a direct and proximate result of these breaches of fiduciary duty, Plaintiff has suffered and continue to suffer substantial damages, including but not limited to: (a) multi-million-dollar realized losses and write-downs on private market and structured investments; (b) loss in value and effective impairment of the ACM2 and downstream investments; (c) the drain of more than $15 million in premiums already paid under the MassMutual policy and the massive opportunity costs associated with locking capital into that product rather than investing in a diversified portfolio; (d) the risk that any future insurance proceeds will be diverted to ACM2 and related parties rather than to Plaintiff's intended beneficiaries; (e) excessive and undisclosed fees, commissions, and compensation to Walton, Vanzo, AWA, and their affiliates; and (f) additional consequential and incidental damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and

reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable.

## COUNT VI
### Breach of Fiduciary Duty by Trustee/Protector
### (Against Walton)

320.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

321.    Defendant Walton served as Trustee and Protector of the Hoffecker Enterprises Irrevocable Grantor Trust ("HEIG Trust"), an irrevocable grantor trust established for the benefit of Plaintiff Hoffecker and his intended beneficiaries.

322.    By virtue of those roles, Walton owed fiduciary duties of utmost good faith, loyalty, prudence, impartiality, and due care to Plaintiff, the HEIG Trust and its beneficiaries, including, without limitation, duties (a) to administer the trust solely in the interests of the beneficiaries, (b) to avoid self-dealing and conflicted transactions, (c) to manage and protect trust property prudently, (d) to keep the grantor/beneficiaries reasonably informed, and (e) to exercise his powers as Trustee and Protector in good faith and in furtherance of the trust's purposes rather than his own personal interests.

323.    Walton caused the HEIG Trust to be created and structured, not as part of any comprehensive estate plan prepared and overseen by independent trust and estates counsel, but as a vehicle through which he could implement an insurance-based strategy of his own design and as a conduit to funnel Plaintiff's assets out of his control and to the control and benefit of Defendants.

324.    The trust instrument that Walton recommended and caused to be implemented vested him, as Trustee, with sweeping discretion to distribute "the whole or any part" of trust income and principal and expressly authorized him to "ignore entirely the interests of any other

person" in exercising those powers.

325.    As Protector, Walton was further empowered to grant or withhold consent to key trustee actions, with silence deemed consent – effectively allowing him to approve his own actions and eliminating meaningful third-party oversight.

326.    Walton used these provisions to entrench his control and compensation rather than to protect Plaintiff's and trust's interests and the trust's beneficiaries.

327.    The HEIG Trust was drafted to permanently strip Plaintiff Hoffecker of any ability to alter, amend, revoke, or terminate the trust, while simultaneously authorizing Walton, as Trustee, to "charge and be paid all usual professional or other charges" without meaningful limitation, neutral oversight, or alignment with the interests of the beneficiaries.

328.    By designing and implementing this structure, Walton breached his fiduciary duty of loyalty by prioritizing his own control and compensation over the interests of Plaintiff, the trust and its beneficiaries, and by embedding in the trust instrument language that expressly contemplated his ability to ignore beneficiary interests in exercising his powers.

329.    Shortly after the HEIG Trust was created, Walton used his trustee and protector roles to cause the HEIG Trust to apply for and purchase a massive whole life insurance policy from MassMutual with a stated death benefit of approximately $154 million (which would pass to the Walton-controlled trust on Plaintiff's death) and annual premiums of roughly $7.6 million.

330.    Walton acted simultaneously as (i) Plaintiff's investment adviser, (ii) architect, trustee and protector of the HEIG Trust, and (iii) MassMutual's agent/producer on the policy.  In doing so, Walton placed himself on all sides of the transaction and used his fiduciary authority over the HEIG Trust to commit trust assets to a product from which he would derive substantial commissions, ongoing compensation and an ultimate windfall, in breach of his duty of loyalty and

his duty to avoid self-dealing.

331.    Walton further breached his fiduciary duties as Trustee and Protector by causing the HEIG Trust to assume the enormous long-term obligation of funding the MassMutual Policy, thereby locking up millions of dollars per year of trust and Plaintiff's capital in an illiquid, high-cost insurance product that was neither designed nor selected through a prudent, independent estate-planning process.

332.    Walton failed to obtain or rely upon independent estate-planning advice, failed to evaluate reasonably available alternatives, including smaller or more conventional policies or other estate-planning tools, and failed to consider the opportunity costs and risks to the trust and beneficiaries of devoting such outsized premiums to the policy.

333.    These acts and omissions constitute breaches of his fiduciary duty of prudence and care.

334.    Walton also misused his powers as Trustee and Protector by structuring and administering the HEIG Trust primarily as a funding and "infinite banking" vehicle for his broader investment scheme.

335.    Among other things, he recommended that the HEIG Trust take out a multi-million-dollar policy loan under the MassMutual Policy within the first two policy years – when cash values were minimal and such borrowing was particularly disadvantageous to the trust and its beneficiaries – in order to finance additional investments recommended or controlled by him.

336.    This recommendation, made while he held fiduciary authority over the trust, subordinated the trust's long-term interests to his preferred investment strategy and compensation streams, and thereby breached his duties of loyalty and prudence.

337.    In addition, Walton failed to keep Plaintiff Hoffecker and the other beneficiaries

reasonably informed about the administration of the HEIG Trust and the risks and implications of the MassMutual Policy and related transactions.

338.   Walton did not fully or fairly disclose to the grantor and beneficiaries the extent of his compensation on the policy, the conflicts created by his simultaneous roles as adviser, trustee, protector, and producer, the illiquidity and opportunity costs associated with the required premiums, or the ways in which related structures – such as the ACM2 buy–sell provisions – positioned entities he controlled to capture life-insurance proceeds upon Mr. Hoffecker's death.

339.   This failure to provide candid and complete information and to obtain informed consent constitutes an additional breach of his fiduciary duties.

340.   Walton further breached his fiduciary duties by using his trustee/protector powers and the HEIG Trust structure to support and integrate with the conflicted ACM2 arrangement, including by aligning the trust-owned MassMutual Policy with a buy–sell framework that allowed ACM2, managed and co-owned by Walton, to capture and deploy life-insurance proceeds for "operational requirements" under manager-controlled standards before any remaining amounts would reach Plaintiff's estate-planning objectives.

341.   In doing so, Walton used the HEIG Trust and its principal asset as a tool to advance the interests of ACM2 and his own economic stake therein, rather than to protect the trust corpus and advance the best interests of the beneficiaries.

342.   Although Walton eventually resigned as trustee in or about July 2024 under the cloud of an SEC investigation, that resignation occurred only after the trust had already been committed to the conflicted MassMutual Policy and related arrangements and after years in which he exercised his powers as Trustee and Protector in a self-interested manner.   His belated resignation does not cure his past breaches or the ongoing harm caused by the structures he

designed and implemented.

343.    As a direct and proximate result of Walton's breaches of fiduciary duty as Trustee and Protector of the HEIG Trust, Plaintiffs have suffered and continue to suffer substantial damages.

344.    These damages include, without limitation: (a) the payment of more than $15 million in premiums to date and the locking up of trust assets in an unsuitable policy; (b) the loss of alternative investment opportunities and corresponding growth that could have been realized had trust assets been prudently invested; (c) exposure to policy-loan, surrender, and administrative risks that threaten the value of the trust's core asset; (d) the risk that any eventual death benefit will be diverted to ACM2 or other Walton-controlled interests rather than to Plaintiff's intended beneficiaries; and (e) additional consequential and incidental damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Walton, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

<u>**COUNT VII**</u>
**Breach of Contract**
**(Against Walton, Vanzo & AWA)**

345.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

346.    The elements of a cause of action for breach of contract are the existence of a valid contract, a breach by one of the parties to the contract, and resulting damages.  See generally *Torres*

*v. Bella Vista Hosp., Inc.,* 523 F. Supp. 2d 123 (D.P.R. 2007); *TBL Collectibles, Inc. v. Owners Ins. Co.,* 285 F. Supp. 3d 1170, 1197 (D. Colo. 2018).

347.    Walton, Vanzo and AWA entered into written investment advisory and assets-under-advisement agreements with Plaintiff, including: (i) an Investment Advisory Agreement between AWA and Hoffecker dated April 25, 2023; (ii) an Investment Advisory Agreement between AWA and Hoffecker dated June 8, 2023; and (iii) an Assets Under Advisement Investment Agreement between Hoffecker and AWA dated August 29, 2024 (collectively, the "Advisory Agreements").

348.    The Advisory Agreements are valid and enforceable contracts supported by adequate consideration.

349.    Under those contracts, AWA, Vanzo and Walton agreed, among other things, to provide ongoing investment advisory and wealth management services to Plaintiff, to treat Plaintiff with a fiduciary standard of care, and to act at all times solely in Plaintiff's best interests.

350.    The April 25 and June 8, 2023 Investment Advisory Agreements expressly provide that "AWA hereby accepts appointment and fiduciary duty of utmost good faith to act solely in the best interest of each client."

351.    The August 29, 2024 Assets Under Advisement Investment Agreements likewise provides, in Exhibit I, that "[i]t is the duty of the Advisor to treat the Client(s) with a Fiduciary Standard of Care – meaning the Client's interests will always be at the forefront – ahead of the interests of any individual Advisor representative or the firm," and that the Advisor will gather necessary information and "recommend an action plan of investment strategies and/or portfolio investments that are designed to accomplish the Client's goals and objectives."

352.    The August 29, 2024 agreement further provides that, "[i]t is agreed that the

Investment Policy Statement is a work in progress that must be updated frequently in order to remain relevant and appropriate".

353.    By their terms and as reasonably implied therefrom, the Advisory Agreements required Walton, Vanzo and AWA, inter alia, to: (a) design, implement, and monitor an investment program reasonably aligned with Plaintiff's objectives, risk tolerance, and liquidity needs; (b) recommend only suitable investments and strategies; (c) provide full and fair disclosure of all material conflicts of interest and all material facts necessary for Plaintiff to make informed decisions; (d) place Plaintiff's interests ahead of their own and those of any affiliated persons or entities; (e) avoid or appropriately manage and mitigate self-dealing and conflicted transactions; (f) provide prudent diversification and risk management; and (g) prepare and use an Investment Policy Statement and other planning tools, as promised, to guide recommendations and implementation.

354.    Plaintiff fully performed his obligations under the Advisory Agreements, including by entering into the agreements in good faith, providing truthful and accurate information about their financial circumstances and objectives, making the capital contributions and transfers requested or recommended by Walton, Vanzo and AWA, and paying the advisory and related fees charged in connection with the services.

355.    Walton, Vanzo and AWA materially breached the Advisory Agreements by failing to act "solely in the best interest" of Plaintiff and by failing to treat Plaintiff's interests as "always… at the forefront" and ahead of their own, as they expressly promised to do.

356.    Instead, they engineered and recommended the conflicted ACM2 equity and loan structure, the South Pointe loan, the ASI Healthcare allocation, and the MassMutual Policy and HEIG Trust structure, all of which were designed in substantial part to enrich Walton, AWA, and

their affiliates at Plaintiff's expense.

357.    Walton, Vanzo and AWA further breached the Advisory Agreements by failing to provide full and transparent written disclosure of material conflicts of interest and material facts, including, without limitation: (a) Walton's managerial control of ACM2; (b) his and his family's 100% ownership of South Pointe; (c) his substantial personal interest in ASI Healthcare; (d) the $551,000 in direct payments to Walton and his family funded from Plaintiff's loan proceeds; (e) his role as producer/agent and commission recipient on the MassMutual Policy; and (f) the fact that ACM2 and entities controlled by Walton stood to capture and direct life-insurance proceeds upon Mr. Hoffecker's death.

358.    Walton, Vanzo and AWA also breached the Advisory Agreements by failing to implement a prudent, diversified investment program reasonably tailored to Plaintiff's needs and risk profile. Instead, they concentrated approximately 77% of Plaintiff Hoffecker's assets in illiquid, high-fee private market investments and structured products, including a roughly 27% allocation to the highly concentrated "Accelerator I" fund and additional speculative positions in Aries, Nano DX, Brevet, CREDE, Cristcot, and other private vehicles, thereby exposing Plaintiff to extreme concentration, credit, and liquidity risk inconsistent with the contractual promise to act in Plaintiff's best interests and to design strategies to accomplish their goals and objectives.

359.    Despite expressly representing in the Assets Under Advisement Investment Agreement that AWA would use an Investment Policy Statement ("IPS") and client interviews to collect the information needed "to create this IPS document" and guide recommendations, and to update the IPS "frequently", Walton, Vanzo and AWA failed to prepare or deliver any such complete or updated IPSs for Plaintiff.

360.    This failure to provide a completed written IPS, or to update it frequently, while

simultaneously soliciting and implementing tens of millions of dollars in complex private and structured investments, constitutes an additional breach of their contractual obligations.

361.    Walton, Vanzo and AWA further breached the Advisory Agreements by (a) recommending that Plaintiff commit approximately $16.5 million to ACM2 – an entity co-owned and co-managed by Walton – on unsecured, subordinated, long-dated terms; (b) structuring the ACM2 and South Pointe arrangements so that Walton and his family received immediate cash payments and equity benefits out of Plaintiff's capital; (c) recommending that Plaintiff fund a $154 million MassMutual whole life policy with $7.6 million annual premiums through an irrevocable trust that Walton himself controlled as trustee and protector; and (d) integrating that policy with ACM2 governance documents that allowed ACM2, a Walton-controlled entity, to capture and deploy life-insurance proceeds.

362.    These acts and omissions violated the express and implied contractual obligations to avoid self-dealing, to manage conflicts, and to put Plaintiff's interests first.

363.    In addition, Walton, Vanzo and AWA breached the Advisory Agreements by failing to exercise reasonable care and diligence in monitoring and revisiting their investment recommendations as material red flags emerged – such as credit deterioration at Aries, liquidity and recapitalization issues at CREDE, and ongoing underperformance and heightened risk across key private holdings – and by failing to correct or mitigate the unsuitable concentrations and structures they had put in place.

364.    As a direct and proximate result of Walton's, Vanzo's and AWA's breaches of the Advisory Agreements, Plaintiff has suffered and will continue to suffer substantial damages, including, without limitation: millions of dollars in realized losses on private and structured investments; the payment of more than $15 million in premiums on an unsuitable and conflicted

life insurance policy; significant opportunity-cost damages associated with capital locked into illiquid and underperforming products; advisory and related fees paid for services that were not rendered in accordance with contractual promises; and additional consequential and incidental damages in amounts to be proven at trial.

365.    Plaintiff is entitled to recover all such damages, together with interest, costs, and such other relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

### COUNT VIII
### Breach of Implied Covenant of Good Faith and Fair Dealing
### (Against Walton, Vanzo & AWA)

366.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

367.    Every contract contains an implied covenant of good faith and fair dealing.  See *Genova v. Banner Health,* 896 F. Supp. 2d 993, 998 (D. Colo. 2012), aff'd, 734 F.3d 1095 (10th Cir. 2013); *Gonzalez-Camacho v. Banco Popular de Puerto Rico*, 318 F. Supp. 3d 461, 483 (D.P.R. 2018).

368.    As alleged above, Plaintiff and AWA (acting through Walton and Vanzo as its representatives) entered into the Advisory Agreements.

369.    These were valid and enforceable contracts pursuant to which AWA agreed to provide ongoing advisory and related services to Plaintiff in exchange for compensation.

370.    Every contract contains an implied covenant of good faith and fair dealing, which requires that neither party do anything that will have the effect of destroying or injuring the other party's right to receive the benefits of the contract.

371.    The implied covenant prohibits a party from exercising contractual discretion in bad faith, from acting dishonestly or opportunistically to appropriate the other party's contractual benefits, and from frustrating the reasonable expectations that arise from the parties' agreement.

372.    By their terms and in light of the surrounding circumstances, the Advisory Agreements gave Walton, Vanzo and AWA broad discretion over the selection, structure, and ongoing management of Plaintiff's investments, and were reasonably understood by the parties to confer on Plaintiff the benefits of: (a) conflict-free or properly managed, fiduciary-caliber investment advice; (b) a portfolio designed and operated in Plaintiff's best interests; (c) transparent disclosure of all material risks and conflicts; and (d) recommendations and implementation decisions made with honesty, loyalty, and prudence.

373.    Walton, Vanzo and AWA breached the implied covenant of good faith and fair dealing by using the discretion and authority conferred by the Advisory Agreements in a manner intended to capture for themselves benefits that the contracts were supposed to deliver to Plaintiff, and to deprive Plaintiff of the fruits of the bargain.

374.    Among other things, Walton, Vanzo and AWA:

- Used the advisory relationship and their discretionary authority over Plaintiff's assets to engineer the ACM2 equity and note structure, knowing that Walton co-owned and controlled ACM2, contributed only nominal capital, and would receive significant immediate and long-term economic benefits from Plaintiff's $16.5 million commitment;

- Structured the ACM2 and South Pointe transactions so that $551,000 of Plaintiff's loan

proceeds were paid directly to Walton and his family, and so that substantial portions of Plaintiff's capital were funneled into entities wholly or substantially owned by Walton and his family, all while retaining for Walton the power to force Plaintiff's redemption at manager-determined or artificially depressed values;

- Recommended and implemented the MassMutual Policy and HEIG Trust structure not in good faith pursuit of Plaintiff's estate-planning interests, but as part of an "infinite banking" and leverage scheme that generated large commissions and ongoing control for Walton, and that was integrated with ACM2's governing documents in a way that positioned Walton-controlled entities to capture potential death benefits; and

- Constructed an extremely concentrated, illiquid, and fee-laden private markets and structured products program that maximized advisory and related fees and favored a "captive" ecosystem of preferred vehicles and sponsors, while exposing Plaintiff to levels of risk, illiquidity, and downside that were fundamentally inconsistent with the benefits and protections they reasonably expected from the Advisory Agreements.

375. Walton, Vanzo and AWA further breached the implied covenant by acting dishonestly and in bad faith in connection with their contractual obligations, including by: (a) failing to provide full and fair disclosure of material conflicts of interest and personal economic stakes in the recommended structures; (b) failing to provide a written Investment Policy Statement and other planning tools they had promised to use as part of the advisory engagement; (c) making aggressive and unfounded performance claims to induce Plaintiff to accept outsized concentrations and speculative positions; and (d) continuing to recommend and maintain conflicted and unsuitable structures even as red flags, underperformance, and risk indicators became apparent.

376. These acts and omissions were not merely negligent or inadvertent; they constitute

bad-faith, opportunistic use of contractual discretion and authority to advance Walton's, Vanzo's and AWA's own interests and to strip Plaintiff of the core benefits he reasonably expected under the Advisory Agreements – namely, honest, loyal, conflict-managed advice and portfolio management designed to protect and grow their assets.

377.    As a direct and proximate result of Defendants' breaches of the implied covenant of good faith and fair dealing, Plaintiff has suffered substantial damages, including, without limitation: (a) the loss and impairment of capital committed to ACM2 and its downstream investments; (b) the payment of multi-million-dollar premiums for an unsuitable and conflicted insurance structure; (c) realized and unrealized losses and heightened risk across the private markets and structured products program; (d) the erosion of liquidity and flexibility in Plaintiff's overall portfolio; and (e) other consequential and incidental damages in an amount to be determined at trial.

378.    Plaintiff is entitled to recover those damages, together with interest, costs, and such other relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton, Vanzo and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

**COUNT IX**
**Negligence and Negligent Supervision**
**(Against Defendants Walton, Vanzo, AWA and AW-LLC)**

379.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

380.    To establish liability for negligence, a plaintiff must demonstrate that the defendant owed the plaintiff a duty, that the defendant breached said duty, that the plaintiff suffered damages, and that those damages were caused by the defendant's breach of duty.  See generally *Martinez-Suarez v. Mansiones de Garden Hills Apartments*, 556 F. Supp. 3d 1 (D.P.R. 2021); *Dolin v. Contemp. Fin. Sols., Inc.,* 622 F. Supp. 2d 1077 (D. Colo. 2009).

381.    At all relevant times, Walton, Vanzo, AWA and AW-LLC, as Plaintiff's investment adviser, adviser representatives and insurance services provider, owed Plaintiff a duty to exercise reasonable care, skill, and diligence in providing investment advice, constructing and monitoring Plaintiff's portfolios, and recommending and implementing investment and insurance transactions.

382.    That duty included, without limitation: (a) reasonably investigating and understanding the risks, costs, and characteristics of the investments, insurance products and strategies they recommended; (b) recommending only suitable investments and insurance products consistent with Plaintiff's objectives, risk tolerance, and liquidity needs; (c) constructing a reasonably diversified and risk-managed portfolio; and (d) avoiding or appropriately managing conflicts of interest so that recommendations were not tainted by self-interest.

383.    AWA and AW-LLC also owed Plaintiffs a duty to exercise reasonable care in the hiring, training, supervision, and oversight of its supervised persons, including but not limited to Walton and Vanzo, and to adopt and enforce policies and procedures reasonably designed to prevent foreseeable harm to clients from conflicted, unsuitable, or negligently implemented investment and insurance strategies.

384.    Walton, Vanzo and AWA breached their duties of reasonable care to Plaintiffs by, among other things:

- Recommending and implementing the ACM2 equity and note structure without conducting

or communicating adequate due diligence as to its risks, one-sided governance provisions, unsecured and subordinated loan terms, and the foreseeable impact of those terms on Plaintiff's liquidity, risk profile, and ability to exit on fair terms;

- Failing to adequately investigate, document, and explain the risks and suitability of the heavily concentrated private markets and structured products program (including Accelerator I, Aries, Nano DX, Brevet, CREDE, Cristcot, MG 100 Static, and substantial structured notes) before committing tens of millions of dollars of Plaintiff's capital;

- Concentrating approximately three-quarters of Plaintiff Hoffecker's portfolio in illiquid private investments and roughly one-quarter in a single private fund, without reasonably evaluating or mitigating the obvious diversification, liquidity, and single-issuer/strategy risks;

- Failing to prepare and use a written Investment Policy Statement and similar planning tools despite the size, complexity, and illiquidity of the recommended program; and

- Failing to monitor, review, and appropriately adjust or exit positions as red flags emerged (including credit deterioration at Aries, structural and performance concerns at Brevet and CREDE, and management/viability concerns at Nano DX), thereby allowing foreseeable losses and risks to compound; and

- Failing to exercise reasonable care in the hiring, training, supervision, and oversight of Walton, Vanzo and other supervised persons involved with Plaintiff's accounts, and in adopting and enforcing policies and procedures reasonably designed to prevent foreseeable harm to clients from conflicted, unsuitable, or negligently implemented investment and insurance strategies.

385.    AWA further breached its duty of reasonable care in supervision by failing to

implement and enforce adequate supervisory and compliance systems designed to identify and address the extensive conflicts of interest, principal-transaction issues, custody risks, and suitability concerns present in the ACM2/ South Pointe/ ASI structure, the HEIG Trust structure, the "infinite banking" MassMutual arrangement, and the private markets program.

386.    Among other things, AWA failed to: (a) detect and appropriately escalate Walton's dual and triple roles in key transactions; (b) require transaction-specific conflict disclosures and approvals; (c) impose reasonable limits on private-markets and single-strategy concentrations; and (d) ensure that recommendations conformed to applicable regulatory standards and AWA's own written policies.

387.    AW-LLC further breached its duty of reasonable care in supervision by, among other things, failing to adopt, implement, and enforce reasonable supervisory policies and procedures over its insurance agents and producers (including Walton) relating to the recommendation, sale, and servicing of life-insurance products; failing to require and document a reasonable suitability and affordability analysis and best-interest determination for the $154 million MassMutual whole-life policy and the related "infinite banking" strategy; failing to require written, pre-sale disclosure of the commission rate or amount and other compensation to be received by AW-LLC and/or Walton, and of the material conflicts of interest presented by Walton's simultaneous roles as Plaintiff's investment adviser and as trustee and protector of the HEIG Trust; failing to supervise the preparation and submission of insurance applications and related paperwork to ensure accuracy and completeness (including with respect to inconsistencies regarding the identity of the insured and policy owner); and failing to prevent, detect, or remediate the use of the HEIG Trust and policy structure as a conduit for conflicted and unsuitable transactions that benefited Walton and his affiliates at Plaintiffs' expense.

388.    As a direct and foreseeable result of the above-described acts and omissions, Plaintiffs suffered the kinds of losses and harms that a reasonably careful adviser, supervising firm, and insurance services provider would have anticipated if they failed to exercise due care – namely, substantial losses and impairment in the value of the ACM2, South Pointe, ASI, and other private investments; extreme concentration and liquidity risk within Plaintiff's portfolios; the establishment of self-serving and conflicted investment vehicles; the payment of more than $15 million in premiums on an unsuitable and improperly structured life insurance policy; and the loss of investment opportunities and returns that Plaintiff would reasonably have expected to achieve had their assets been prudently managed and their insurance needs appropriately addressed.

389.    By reason of the foregoing, Defendants Walton, Vanzo, AWA and AW-LLC are liable to Plaintiffs for negligence and negligent supervision.

390.    As a direct and proximate result of Defendants' negligence, Plaintiffs have sustained and will continue to sustain substantial damages, including, without limitation, realized and unrealized investment losses, loss of use of capital, opportunity-cost damages, premium payments, and other consequential and incidental damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Walton, Vanzo, AWA and AW-LLC, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; and, (d) such other relief as the Court deems just and equitable

### COUNT X
**Unjust Enrichment / Disgorgement**
**(Against All Defendants)**

391.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set

forth herein.

392.    The elements of an unjust enrichment claim are: (1) an enrichment of a defendant, (2) at plaintiff's expense, (3) a relation between the enrichment and the deprivation, (4) under circumstances that would make it unjust for the defendant to retain the benefit.  See generally *Wiley v. Stipes,* 595 F. Supp. 2d 179, 188 (D.P.R. 2009); *Oaster v. Robertson*, 173 F. Supp. 3d 1150 (D. Colo. 2016).

393.    Defendants have each been enriched, directly or indirectly, by receiving substantial economic benefits derived from Plaintiff's assets, capital commitments, and premium payments, including but not limited to: advisory and related fees paid to AWA (and ultimately to Vanzo and to Walton as owner/principal of AWA); fees paid to Walton as trustee and/or protector of the HEIG Trust; direct cash payments of approximately $551,000 to Walton and his family funded from Plaintiff's $9.5 million loan to ACM2; Walton's and his family's equity and profit interests in ACM2 and South Pointe, which were capitalized and supported by Plaintiff's $16.5 million ACM2 commitment; Walton's substantial ownership and economic interests in downstream investments such as ASI Healthcare that were funded, in material part, from Plaintiff's capital; commissions and any related amounts paid to Defendants with respect to the MassMutual Policy; and, more than $15 million in premiums, policy charges, and related amounts paid to MassMutual in connection with the $154 million MassMutual Policy.

394.    These benefits were conferred at Plaintiffs' expense.

395.    The enrichment of Defendants is unjust and inequitable because, as alleged in detail above:

- Walton and AWA engineered and recommended the ACM2 structure, South Pointe loan, and related transactions not to serve Plaintiff's best interests, but to create, divert and

capture multiple streams of value for Walton, his family, and entities he owned or controlled;

- Walton, Vanzo and AWA used their advisory position and the trust of Plaintiff to direct tens of millions of dollars of Plaintiff's capital into conflicted, one-sided, and unsuitable structures that generated fees, commissions, and upside for themselves and their affiliates while exposing Plaintiff to extreme risk, illiquidity, and downside;

- ACM2 and South Pointe were capitalized and sustained with Plaintiff's funds on terms that heavily favored Walton and his family, including immediate cash payments to them and contractual rights allowing them to force Plaintiff's redemption at manager-determined or artificially depressed values;

- MassMutual accepted and retained enormous premiums on a whole life policy that, as structured and sold here, was inconsistent with its own stated guidance regarding "personal banking" / "infinite banking" concepts and was procured through a producer who simultaneously served as Plaintiff's investment adviser and trustee/protector of the trust that owned the policy; and

- Defendants have refused to unwind, rescind, or restore Plaintiff to the position he would have occupied but for the conflicted structures, misrepresentations, omissions, and regulatory violations described herein, despite detailed notice of Plaintiff's grievances.

396.    To the extent any of the relevant contracts are deemed void, voidable, rescinded, or otherwise insufficient to govern the full scope of the parties' dealings, or to the extent any Defendant is found not to be in privity of contract with Plaintiffs, equity and good conscience nonetheless require that Defendants not be allowed to retain the benefits they obtained from Plaintiffs' assets and capital.

397.    Even if valid contracts are found to exist, equity likewise requires that Defendants disgorge the profits, fees, commissions, and other economic benefits that they obtained through self-dealing, conflicts of interest, breaches of duty, and other wrongful conduct.

398.    Accordingly, Plaintiffs seek restitution from, and disgorgement by, each Defendant of all unjust benefits received from or traceable to Plaintiffs' assets and capital, including but not limited to:

- all advisory, management, or related fees paid to AWA in connection with the advisory relationship and investments;

- all direct cash payments to Walton and his family funded from Plaintiff's ACM2 loan proceeds, as well as the value of Walton's equity and profit participation in ACM2, South Pointe, and other entities to the extent such value is derived from Plaintiff's capital commitments;

- all commissions, compensation, and related economic benefits MassMutual, Walton, Vanzo, AW-LLC and any affiliated producers earned in connection with the MassMutual Policy funded by Plaintiff;

- all fees paid to Walton as trustee and/or protector of the HEIG Trust; and

- any other profits, distributions, or economic benefits realized by Defendants that are causally connected to Plaintiffs' capital, premiums, or other property.

399.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have suffered and continue to suffer substantial harm, including the loss and impairment of capital, payment of excessive and conflicted fees and commissions, and the deprivation of the use and benefit of funds that rightfully belong to them.

400.    Plaintiffs are entitled to restitution, disgorgement of all ill-gotten gains, the

imposition of a constructive trust over assets and proceeds traceable to his capital, and such other equitable relief as the Court deems just and proper.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment against those Defendants found to have been unjustly enriched by, or to have received ill-gotten gains derived from, Plaintiffs' assets, jointly and severally to the fullest extent permitted by law, and respectfully request that the Court:

a. Order such Defendants to disgorge and pay over to Plaintiffs, as restitution, all fees, commissions, advisory compensation, policy-related compensation, distributions, profits, and any other benefits, directly or indirectly obtained from or at the expense of Plaintiffs;

b. Impose a constructive trust and/or equitable lien in favor of Plaintiffs over all funds, assets, and property, and all proceeds thereof, traceable to Plaintiffs' capital, premiums, or other assets wrongfully obtained, retained, or used by such Defendants;

c. Direct such Defendants to provide a full and complete accounting of all monies, assets, and other benefits received from, or derived from, Plaintiffs' funds or investments, sufficient to identify all ill-gotten gains subject to restitution and disgorgement;

d. Award Plaintiffs pre-judgment and post-judgment interest on all such amounts, at the maximum rate allowed by law; and

e. Grant such other and further legal or equitable relief as the Court deems just and proper.

### COUNT XI
### Aiding and Abetting Fraud
### (Against South Pointe)

401.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

402.    A defendant is liable for aiding and abetting when: (1) a primary wrongdoer

commits a wrongful act that causes injury to the plaintiff; (2) the defendant, at the time it provided assistance, was generally aware of its role in the overall illegal or tortious activity; and (3) the defendant knowingly provided substantial assistance to the commission of the primary wrong of violation.  See generally *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 143 S. Ct. 1206, 1209, 215 L. Ed. 2d 444 (2023) citing *Halberstam v. Welch*, 705 F.2d 472, 477(D.C. Cir. 1983); *In re HomeAdvisor, Inc. Litig.,* 491 F. Supp. 3d 879 (D. Colo. 2020).

403.    South Pointe knowingly participated in and substantially assisted the fraudulent scheme perpetrated by Walton and AWA in connection with Plaintiff's ACM2 investment and related loans.

404.    South Pointe is a Walton-controlled entity in which Walton and his family own all of the outstanding equity.

405.    Through Walton and his family members, South Pointe had actual knowledge of the conflicted structure of the ACM2 transaction, including that (a) Plaintiff was being induced, based on Walton's investment advice, to commit $16.5 million in total capital to ACM2, and (b) ACM2 would immediately funnel Plaintiff's $7 million equity contribution, and approximately $7.5 million of Plaintiff's subsequent $9.5 million loan, to South Pointe on unsecured and highly unfavorable terms that placed Plaintiff at the bottom of the capital structure.

406.    South Pointe, acting through Walton and his family, knowingly entered into and accepted the December 26, 2023 promissory note from ACM2 and the related Note Purchase Agreement structure, pursuant to which South Pointe became the primary borrower and beneficiary of Plaintiff's capital while providing no meaningful collateral or investor protections, and while acknowledging that any future secured financing would be senior to Plaintiff's notes.

407.    South Pointe further knew that the Note Purchase Agreement expressly allocated

approximately $551,000 of Plaintiff's $9.5 million loan to be paid directly to Walton and his family members, while simultaneously directing approximately $7.5 million of those proceeds to South Pointe itself and an additional $2 million to ASI Healthcare, in which Walton personally held a substantial equity interest.

408.    South Pointe thus knew that Plaintiff's capital was being structured to generate multiple direct economic benefits for Walton and his affiliates at Plaintiff's expense.

409.    Upon information and belief, South Pointe, acting through Walton, also used Plaintiff's capital to acquire or finance the Spring Hill, Tennessee development property from a predecessor entity in which Walton held an ownership interest, thereby further enriching Walton and his affiliates while leaving Plaintiff exposed to unsecured, subordinated credit risk tied to the same property.

410.    South Pointe additionally agreed to and benefited from a consulting and profit-sharing arrangement under which it was obligated to pay ACM2, at least annually, a fee equal to a substantial portion of the value of its assets and net profits, but, upon information and belief, has failed to make the required payments while retaining and deploying Plaintiff's capital for its own benefit.

411.    By knowingly accepting Plaintiff's funds on these terms, allowing its corporate form to be used as the primary vehicle for the conflicted loan structure, and participating in the above-described transactions, South Pointe substantially assisted Walton and AWA in concealing the true nature and extent of their self-dealing and conflicts of interest, and in presenting the ACM2/South Pointe structure to Plaintiff as a suitable, arm's-length investment when it was not.

412.    South Pointe also failed to disclose, and took no steps to correct, the material misstatements and omissions made by Walton and AWA concerning the risks, conflicts, and

economics of the ACM2 and South Pointe transactions, despite knowing that Plaintiff was relying on Walton's advice and on the written transaction documents in deciding to commit and maintain his capital.

413.    At all relevant times, South Pointe, through Walton and his family, directly profited from the fraudulent scheme, including, without limitation, through receipt and use of Plaintiff's $7 million equity-funded loan and approximately $7.5 million of Plaintiff's $9.5 million loan, the acquisition and/or development of the Spring Hill property using Plaintiff's capital, and the avoidance of market-standard collateral, covenants, and investor protections that a non-conflicted borrower would have been required to provide.

414.    South Pointe's knowledge of the fraudulent scheme and substantial assistance in implementing and maintaining the ACM2/South Pointe structure were a substantial factor in enabling Walton and AWA's fraud and in causing Plaintiff's resulting losses.

415.    As a direct and proximate result of South Pointe's aiding and abetting of Walton and AWA's fraud, Plaintiff has suffered damages in an amount to be determined at trial, including, without limitation, the loss, impairment, or severe risk to the $16.5 million committed to ACM2 and South Pointe, lost investment opportunities, and other consequential damages.  South Pointe's conduct was willful, wanton, and in conscious disregard of Plaintiff's rights, warranting an award of punitive or exemplary damages to the extent permitted by law.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Walton and AWA, jointly and severally, and provide the following relief: (a) compensatory damages, incidental damages, and consequential damages; (b) costs, interest, and reasonable attorneys' fees; (c) prejudgment and post-judgment interest; (d) punitive damages; and, (e) such other relief as the Court deems just and equitable

## COUNT XII
### Rescission and Declaratory Judgment – ACM2 Investment,
### Note, HEIG Trust and Related Agreements
### (Against Walton, AWA, AW-LLC, ACM2, and South Pointe)

416.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

417.    At Walton's recommendation and while Walton and AWA were acting as Plaintiffs' investment adviser and fiduciaries, Plaintiffs entered into two related sets of transactions and agreements that are the subject of this Count: (i) Plaintiff Hoffecker's investment in and loan to ACM2 (the "ACM2 Investment" and "ACM2 Note," respectively); and (ii) the formation and funding of the Hoffecker Enterprises Irrevocable Grantor Trust (the "HEIG Trust") and the procurement, ownership, and funding of the MassMutual whole life policy through that irrevocable trust structure (the "HEIG Trust Structure").

418.    The ACM2 Investment and ACM2 Note were memorialized in a series of written instruments, including, without limitation, the ACM2 operating agreement, ACM2 Buy–Sell Agreement, Note Purchase Agreement and related Promissory Note, the ACM2–South Pointe promissory note dated December 26, 2023, and related documents (collectively, the "ACM2 Agreements").

419.    The HEIG Trust Structure was memorialized in and implemented through the HEIG Trust instrument dated on or about October 11, 2023 (the "HEIG Trust Agreement"), the trustee and protector appointment and compensation provisions therein, any related trust amendments or side letters, and the insurance application, ownership, premium-funding, and servicing documentation executed in the HEIG Trust's name with respect to the MassMutual Policy (collectively, the "HEIG Trust Agreements").

420.    As alleged above, the ACM2 Agreements and the HEIG Trust Agreements were

procured by, and are permeated with, fraud, material misrepresentations and omissions, breaches of fiduciary duty, self-dealing, and serious regulatory violations, including but not limited to violations of Sections 206(2), 206(3) and 215 of the Investment Advisers Act and the rules thereunder.

421.    Walton and AWA induced Plaintiff Hoffecker to enter into the ACM2 Agreements and commit $16.5 million in capital and credit exposure while failing to sufficiently disclose material facts, including: (a) Walton's 50% beneficial ownership and managerial control of ACM2, despite contributing only nominal capital; (b) Walton's and his family's 100% ownership of South Pointe, the primary borrower and recipient of ACM2 loan proceeds; (c) Walton's substantial personal ownership interest in ASI Healthcare and ACM2's use of Plaintiff's capital to acquire a position in ASI Healthcare; (d) the allocation of approximately $551,000 of Plaintiff's $9.5 million loan to be paid directly to Walton and his family; and (e) the one-sided governance, forced-redemption, valuation, and transfer provisions that trapped Plaintiff's capital in an illiquid, manager-controlled vehicle and allowed Walton to force redemption at artificially depressed "book value" bearing no reasonable relationship to Plaintiff's $16.5 million economic stake.

422.    Walton and AWA also induced Plaintiff Hoffecker to implement the HEIG Trust Structure and enter into the HEIG Trust Agreements without full and fair disclosure of material facts, including: (a) that Walton had himself installed in dual roles as both Trustee and Protector of the HEIG Trust, thereby consolidating unchecked control over trust assets; (b) that the HEIG Trust Agreement permanently stripped Plaintiff Hoffecker of the power to alter, amend, revoke, or terminate the trust while granting Walton sweeping discretion over trust income and principal and broad compensation rights; (c) that Walton, through AW-LLC, acted as insurance agent and producer of the MassMutual Policy owned by the HEIG Trust and stood to receive substantial

commissions and other compensation upon the sale; (d) that the HEIG Trust and policy structure were designed and promoted as part of an "infinite banking" strategy, including contemplated policy borrowing, rather than a conventional estate-planning structure vetted by independent trust-and-estates counsel; and (e) that Walton's overlapping roles as investment adviser, trustee, protector, and insurance producer created pervasive conflicts of interest that were neither properly disclosed nor mitigated.

423.    Plaintiffs did not receive full and fair disclosure of these material facts prior to entering into the ACM2 Agreements and the HEIG Trust Agreements, and Plaintiffs would not have committed capital to ACM2, agreed to the ACM2 Note, created and funded the HEIG Trust, or caused the HEIG Trust to purchase and fund the MassMutual Policy on the terms that they did had the true facts been disclosed.

424.    Rather, Plaintiffs reasonably understood, and were led to believe, that the ACM2 structure was a fairly structured, mutually aligned co-investment vehicle and that the HEIG Trust Structure and associated insurance strategy were appropriate and suitable for Plaintiffs' circumstances, when in fact these arrangements were engineered primarily to benefit Walton, AWA, AW-LLC and Walton-affiliated entities and to entrench Walton's control and compensation at Plaintiffs' expense.

425.    The ACM2 Agreements and the HEIG Trust Agreements also embody and operationalize multiple breaches of Walton's and AWA's fiduciary duties as investment adviser and adviser representative, including the duty of loyalty, the duty to act solely in Plaintiffs' best interests, and the duty to avoid or fully and fairly disclose and properly manage conflicts of interest. Walton used his fiduciary position, and AWA's advisory mandate, to place Plaintiffs' capital into adviser-controlled structures, to secure for himself and his family immediate cash payments and

long-term upside, and to obtain extraordinary control rights over Plaintiffs' assets, all without obtaining Plaintiffs' informed consent to those conflicts.

426. In addition, the ACM2 Agreements reflect and implement unlawful principal transactions within the meaning of Section 206(3) of the Investment Advisers Act, because Walton, acting as Plaintiff Hoffecker's investment adviser, caused his advisory client to (a) purchase a 50% membership interest in ACM2, an entity he co-owned and managed, and (b) purchase a $9.5 million unsecured note issued by that same adviser-controlled entity, all without providing the required written, transaction-specific disclosure of his principal capacity and without obtaining Plaintiff's informed, transaction-by-transaction consent. These undisclosed principal trades are grounds for rescission of the resulting securities transactions and related contracts.

427. Separately, the HEIG Trust Agreements are likewise void, voidable, and/or subject to rescission because they were induced and implemented through Walton's self-dealing and breaches of fiduciary duty, including his acquisition and exercise of trustee and protector authority over an irrevocable trust funded with Plaintiffs' assets, while simultaneously acting as insurance producer on the MassMutual Policy and as Plaintiffs' investment adviser.

428. To the extent the HEIG Trust Agreements were entered into or performed in connection with violations of the Investment Advisers Act or other applicable law, they are void under Section 215 and are subject to appropriate equitable relief, including rescission, restitution, and disgorgement.

429. Equity, good conscience, and the governing principles of rescission and declaratory relief do not permit Defendants to retain the benefits of the ACM2 Agreements and the HEIG Trust Agreements, or to continue to enforce those agreements against Plaintiffs, where those agreements were induced by fraud and breaches of fiduciary duty, are saturated with undisclosed

conflicts and self-dealing, and operate in a manner that is fundamentally unfair and unconscionable.

430.    Plaintiffs therefore seek rescission of the ACM2 Agreements and the HEIG Trust Agreements and restoration, to the fullest extent practicable, of the status quo ante.

431.    Plaintiffs are prepared to tender back and surrender, and hereby offer to tender back and surrender: (a) Plaintiff Hoffecker's membership interest in ACM2; (b) Plaintiff Hoffecker's rights under the ACM2 Note and related instruments; and (c) any benefits received, if any, in connection with the HEIG Trust Structure, subject to appropriate equitable set-offs and adjustments, and further subject to the Court's direction as to how any remaining HEIG Trust assets should be administered or distributed in connection with rescission.

432.    Plaintiffs further seek a declaration of their rights and the parties' obligations with respect to the ACM2 Investment and related agreements, including, without limitation, declarations that: the ACM2 Agreements are rescinded, void, or voidable at Plaintiffs' election as a result of Defendants' fraud, breaches of fiduciary duty, and regulatory violations; Plaintiffs have no further obligations to contribute capital, make payments, or otherwise perform under the ACM2 Agreements; and any purported obligations of Plaintiffs under the ACM2 Agreements, including any capital-call, forced-redemption, or transfer-restriction provisions, are unenforceable.

433.    Plaintiffs also seek a declaration of their rights and the parties' obligations with respect to the HEIG Trust Structure, including, without limitation, declarations that: the HEIG Trust Agreement and related HEIG Trust Agreements are rescinded, void, or voidable at Plaintiffs' election as a result of Defendants' fraud, breaches of fiduciary duty, and regulatory violations; Walton has no present or future authority to act as trustee, protector, agent, or fiduciary with respect to the HEIG Trust or any assets formerly held by it; and any fees, commissions, or other

compensation obtained in connection with the HEIG Trust Structure are subject to restitution and disgorgement.

434.    Plaintiffs further seek declarations that any value, property, or proceeds traceable to Plaintiff Hoffecker's $16.5 million ACM2 commitment, to HEIG Trust assets, and/or to premiums or other payments made in connection with the MassMutual Policy that are held by ACM2, South Pointe, Walton, AWA, AW-LLC, or any of their affiliates are held in constructive trust for Plaintiffs' benefit and must be returned or accounted for in connection with rescission, together with such other equitable relief as may be required to prevent unjust enrichment.

435.    In the alternative, to the extent full rescission is deemed impracticable, Plaintiffs seek a declaratory judgment reforming, limiting, or voiding those provisions of the ACM2 Agreements and/or the HEIG Trust Agreements that are unconscionable, contrary to public policy, or the product of fraud, and awarding such equitable relief, restitution, and disgorgement as is necessary to prevent Defendants from retaining the benefits they obtained through the wrongful conduct alleged herein.

436.    Rescission and declaratory relief are necessary and appropriate to redress these harms and to prevent ongoing and future injury.

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment the following relief:

a. Rescinding the ACM2 Investment in its entirety, including Plaintiff's subscription for, and acquisition of, any equity, membership, or other ownership interests in ACM2, and all transactions undertaken in connection therewith;

b. Rescinding and declaring null, void, and of no force and effect the ACM2 Note and all related agreements, instruments, amendments, guarantees, security agreements, pledge

agreements, side letters, and other ancillary documents entered into in connection with the ACM2 Investment, collectively, the ACM2 Agreements;

c. Rescinding and declaring null, void, and of no force and effect the HEIG Trust Agreement and the HEIG Trust Agreements, including the provisions appointing Walton (and/or any of his designees) as trustee and/or protector and any provisions conferring compensation rights, and ordering that the HEIG Trust be unwound and terminated to the fullest extent practicable consistent with applicable law;

d. Entering a declaratory judgment that Plaintiffs have no further payment, performance, or other obligations of any kind under the ACM2 Agreements or the HEIG Trust Agreements, and that no Defendant has any valid right, title, interest, lien, or claim against Plaintiffs or their assets arising out of or relating to the ACM2 Investment, the ACM2 Note, the ACM2 Agreements, HEIG Trust Structure, or the challenged agreements;

e. Ordering Defendants to unwind the ACM2 Investment and all transactions effectuated pursuant to the ACM2 Agreements and the HEIG Trust Structure and to restore the parties, to the fullest extent practicable, to the status quo ante, including by returning to Plaintiff all capital contributions, principal, interest, fees, commissions and any other amounts paid or transferred by or on behalf of Plaintiffs in connection with the ACM2 Investment, ACM2 Note, and/or HEIG Trust Structure, together with pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Ordering the cancellation, discharge, and/or release of any liens, security interests, or other encumbrances granted or purportedly granted pursuant to the ACM2 Agreements, including directing the filing or recording of such terminations, releases, or satisfactions as may be necessary to clear title and public records;

g. Directing Defendants to execute and deliver such instruments, releases, assignments, trust termination documents, and other documentation as may be necessary or appropriate to effectuate the rescission, declaratory relief, and other remedies awarded by the Court, including the cancellation, discharge, and/or release of any liens, security interests, or other encumbrances granted or purportedly granted pursuant to the challenged agreements;  and

h. Awarding Plaintiff such other and further legal and equitable relief as the Court deems just and proper.

## COUNT XIII
### Violations of Puerto Rico Uniform Securities Act – Articles 201, 301, 405 and 410
### (Against Walton & AWA)

437.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

438.    At all relevant times, the membership interest and note interests that Plaintiff Hoffecker acquired from Walton and AWA in ACM2 (the "ACM2 Securities") constituted "securities" within the meaning of the Puerto Rico Uniform Securities Act ("PRUSA").

439.    Plaintiff's investments in ACM2 were offered and sold in Puerto Rico and/or as part of a distribution that included offers and sales in Puerto Rico, thereby subjecting the ACM2 Securities and the offering to PRUSA and the jurisdiction and authority of the Puerto Rico Office of the Commissioner of Financial Institutions ("OCIF").

440.    Upon information and belief, (i) no offering documents were issued other than the LLC agreement(s), (ii) the ACM2 Securities are not "federally covered securities," and (iii) no exemption request was filed with OCIF for the offering and sale of the ACM2 Securities to Plaintiff.

441.    Under Article 410 of PRUSA, any person who violates Articles 201, 301, or 405 is

liable to the investor who purchased the security, and the investor may bring a civil action to recover the price paid for the security, plus interest at the judicial rate, costs, and reasonable attorneys' fees, less any income received, upon tender of the security, or for damages if the investor no longer owns it.

442.    Any person who directly or indirectly controls a seller liable under Article 410 is jointly and severally liable to the same extent as the seller.

**A.  Article 301 – Unregistered Offer and Sale of Securities**

443.    Under Article 301 of PRUSA, it is unlawful for any person to offer or sell any security in Puerto Rico unless (i) the security is registered with OCIF, (ii) the security or transaction is exempt under PRUSA, or (iii) it is a federally covered security.

444.    Defendants' offer and sale of the ACM2 Securities to Plaintiff were not registered with OCIF, were not federally covered, and, upon information and belief, were not the subject of any properly requested or confirmed exemption from OCIF.

445.    Under Puerto Rico law, exemptions under PRUSA are not automatic and generally must be requested or confirmed by OCIF.

446.    By offering and selling the ACM2 Securities to Plaintiff in Puerto Rico without registration, without federally covered status, and without any valid, OCIF-confirmed exemption, Defendants violated Article 301 of PRUSA.

447.    Walton, as a control person of AWA and ACM2, and as an individual who directly or indirectly controlled the offer and sale of the ACM2 Securities, is jointly and severally liable for these violations under Article 410.

**B.  Article 201 – Unregistered Broker / Investment Adviser Activity**

448.    Under Article 201 of PRUSA, any person who solicits investments without being

a registered broker or agent commits a separate violation unless an exemption applies (for example, certain issuer transactions without commissions to unregistered persons).

449.    Additionally, if a person manages pooled investor funds and receives management or performance fees, that person may also be acting as an investment adviser, requiring registration or an exemption.

450.    As under Article 301, exemptions under PRUSA are not automatic and must be requested or confirmed by OCIF.

451.    Upon information and belief, Defendants solicited Plaintiff's investments in the ACM2 Securities in Puerto Rico, managed pooled investor funds through ACM2, and received or were entitled to receive management and/or performance compensation in connection with those pooled funds, thereby acting as brokers, agents, and/or investment advisers within the meaning of Article 201.

452.    Upon information and belief, Walton, AWA and ACM2 were not properly registered with OCIF as brokers, agents, or investment advisers in connection with the ACM2 offering, and neither they did not obtain or secure any valid, OCIF-confirmed exemption from such registration requirements.

453.    By soliciting Plaintiff's investments and managing pooled investor funds in ACM2 while unregistered and without any valid exemption, Defendants violated Article 201 of PRUSA, giving rise to civil liability under Article 410.

C.  **Article 405 – Securities Fraud (Material Misstatements and Omissions)**

454.    Under Article 405 of PRUSA, it is unlawful for any person, in connection with the offer, sale, or purchase of any security, to make any material misstatement or omission, or otherwise to engage in fraudulent or deceptive conduct.

455.    Article 405 parallels SEC Rule 10b-5 and prohibits materially misleading statements or omissions regarding, among other things, expected returns, risks, or the structure of the investment.

456.    As alleged above in detail, in connection with the offer and sale of the ACM2 Securities, as well as other securities set forth above, Defendants made one or more material misstatements and omitted material facts, including with respect to ACM2, without limitation, misstatements and omissions concerning: the true risks, volatility, and potential losses associated with the ACM2 investment and related strategy; the structure of ACM2, the purported "series" LLC arrangement, and the extent to which any series-type structure would segregate or protect assets and liabilities, particularly in light of the fact that the requirements for effective series segregation under Puerto Rico's General Corporations Act were not satisfied; the regulatory status of the offering under PRUSA, including the absence of registration of the ACM2 Securities with OCIF, the lack of any properly obtained or confirmed exemption, and the failure to comply with PRUSA's broker, agent, and/or investment-adviser registration requirements; and other material facts necessary to make the statements actually made to Plaintiff, in light of the circumstances under which they were made, not misleading.

457.    These misstatements and omissions were made in connection with the offer and sale of the ACM2 Securities to Plaintiff, were material to a reasonable investor, and were made at least negligently, and upon information and belief, willfully or recklessly.

458.    Plaintiff reasonably relied, and was entitled to rely, on Defendants' statements and omissions concerning ACM2's structure, regulatory status, and risk profile, and would not have invested in ACM2, or would have invested on materially different terms, had the true facts been disclosed.

459.    By making these material misstatements and omissions and otherwise engaging in deceptive conduct in connection with the offer and sale of the ACM2 Securities, Defendants violated Article 405 of PRUSA, giving rise to civil liability under Article 410.

### D.  Resulting Liability and Damages (Article 410)

460.    Under Article 410 of PRUSA, any person who violates Articles 201, 301, or 405 is liable to the investor who purchased the security, and the investor may bring a civil action to recover the price paid for the security, plus interest at the judicial rate, costs, and reasonable attorneys' fees, less any income received.

461.    Any person who directly or indirectly controls a seller liable under Article 410 is jointly and severally liable to the same extent as the seller.

462.    As a direct and proximate result of Defendants' violations of PRUSA, Plaintiff has suffered substantial losses and damages in connection with his ACM2 investment and is entitled to the full measure of statutory relief and remedies provided by Article 410.

**WHEREFORE,** Plaintiff demands judgment for Violations of the Puerto Rico Uniform Securities Act, Articles 201, 301, 405, and 410, against Defendants jointly and severally to the fullest extent permitted by law, and respectfully request that the Court:

a. Award Plaintiff the price paid for the ACM2 Securities, together with interest at the applicable judicial rate, less any income received, as authorized by Article 410;

b. Alternatively, to the extent Plaintiff no longer owns some or all of their ACM2 interests, award him damages in the amount of their losses attributable to Defendants' PRUSA violations, together with pre-judgment and post-judgment interest;

c. Award Plaintiff his costs and reasonable attorneys' fees incurred in prosecuting this action, as authorized by Article 410; and

d. Grant such other and further legal and equitable relief as the Court deems just and proper.

Dated:  January 16, 2026

          **McCONNELL VALDÉS LLC**
          270 Muñoz Rivera Ave.
          Hato Rey, PR  00918
          P.O. Box 364225
          San Juan, PR  00936-4225
          http://www.mcvpr.com
          Tel. (787) 250-5637
          Fax. (787) 759-8282
          *Attorneys for Plaintiffs*

          /s/ Alejandro J. Cepeda-Díaz
          Alejandro J. Cepeda-Díaz
          USDC-PR No. 222110
          ajc@mcvpr.com

          /s/ Sonia M. López-del Valle
          Sonia M. López-del Valle
          USDC-PR No. 231413
          sld@mcvpr.com

          *Pro hac vice application forthcoming:*
          **McCORMICK & O'BRIEN, LLP**

          By:_____
            Liam O'Brien, Esq.
            125 Park Avenue, 25th Flr.
            New York, New York 10017
            Telephone: (212) 320-8972 x700
            lobrien@mcoblaw.com
            *Attorneys for Plaintiffs*